IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-151-TAV-DCP |
| | ) | |
| ALIM TURNER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATON**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on the following Motions to Suppress[1]: Defendant Ronald Turner's Motion to Suppress All Intercepted Communications in Which Ronald Turner is a Participant in the Communication (TT-2) [Doc. 186]; Defendant Alim Turner's First Motion to Suppress Fruits of Wiretaps (TT-1, TT-2, and TT-2/TT-3) [Doc. 188]; Defendant Ushery Stewart's Motion to Suppress—Title III Wiretap on TT-2 [Doc. 189]; Defendant Ushery Stewart's Motion to Suppress—Title III Wiretap on TT-3 [Doc. 190]; Defendant Ronald Turner's Motion to Adopt Doc. 189 (TT-2) [Doc. 192]; Defendant Kedaris Gilmore's Motion to Adopt Codefendant Stewart Motion to Suppress Doc. 190 (TT-3) [Doc. 209]; Defendant Mahlon Prater's Motion to Suppress all Intercepted Communications in Which Defendant Prater is a Participant in the Communication (TT-1, TT-2 and TT-2/TT-3) [Doc. 212]; and Defendant Antoinette Turner's

---

[1] There are three target telephone ("TT") wiretaps that serve as the subjects of the various motions. Unless noted in the title of the motion, the specific target telephone wiretap(s) at issue is noted in parentheses following the title as (TT-1), (TT-2) or (TT-2/TT-3).

Motion to Adopt Co-Defendants' Motions 188, 189, and 212 (TT-1, TT-2 and TT-2/TT-3) [Doc. 238].

The Government filed its consolidated responses in opposition to Defendants' Motions to Suppress Docs. 186, 188, 189, 190, 192, 209 and 212 [Doc. 231] and to Defendant Antoinette Turner's Motion to Suppress Doc. 238 [Doc. 270]. Defendant Stewart filed a Reply [Doc. 245]. On November 4, 2020, the Court conducted a hearing on the Defendants' motions. Assistant United States Attorneys David Lewen and Kevin Quencer appeared on behalf of the Government. The following attorneys appeared on behalf of the Defendants: Robert Kurtz for Ronald Turner, Russell Greene for Alim Turner, James Varner (via telephone) for Antoinette Turner, John Barnes for Ushery Stewart, Jamie Poston Hughes for Kedaris Gilmore, and Gerald Gulley for Mahlon Prater. At the conclusion of the hearing, the Court took the matter under advisement.

Following the hearing, Defendant Billips belatedly moved [Doc. 339] to adopt the previously filed motions to suppress by Defendants Ronald Turner, Alim Turner, Stewart, and Prater—Docs. 186, 188, 189, 190, and 212—as well as the supporting memoranda, Docs. 187 and 213. The adoption of these various motions incorporates challenges to all three wiretaps. For its response [Doc. 348], the Government states that it relies on its previous consolidated response (Doc. 231).

As a preliminary matter, the Court notes that under Title III, an individual has standing to challenge only an interception that was directed at him or that resulted in interception of conversations in which he participated. 18 U.S.C. § 2518(10)(a) (giving standing to any "aggrieved person"); *id.* § 2510(11) (defining "aggrieved person" as a person who was a party to an intercepted communication or a person against whom the interception was directed). Here, Defendants assert that they are aggrieved persons under Title III because they are either targets

2

named in one or more of the respective wiretap orders or that their telephone communications to and from the target telephones were intercepted. The Government has not raised any issue as to Defendants' standing; however, with respect to Defendant Antoinette Turner, who asserts her challenges to all three wiretaps through the adoption of codefendants' motions, the Court finds that she has alleged a basis for standing to challenge only TT-2 through her assertion that the Government has indicated an intent to use evidence of conversations involving her obtained as a result of the "TT-2 . . . June 2019" wiretap. [Doc. 238 at 1]. Defendant Antoinette Turner was not a named target in any of the wiretap applications, and she does not maintain that any of her communications were obtained through the March (TT-1) or July (TT-2/TT-3) wiretaps, Accordingly, her motion to adopt should be denied as to the arguments to suppress TT-1 and TT-2/TT-3.[2]

For the reasons set forth herein, the Court recommends that Defendants' motions to adopt be **GRANTED**, with the exception that Defendant Antoinette Turner's motion [**Doc. 238**] be **GRANTED IN PART and DENIED IN PART**, and that Defendants' motions to suppress be **DENIED**.

## I. BACKGROUND AND PARTIES' POSITIONS

On September 4, 2019, an Indictment was returned by the Grand Jury charging six Defendants—Alim Turner, Ronald Turner, Ushery Stewart, Gilmore, Hounschell, and Michael Stewart—with a 50-gram or more methamphetamine trafficking conspiracy.[3] [Doc. 3]. On March

---

[2] Should Defendant Antoinette Turner be permitted to join in the motions to suppress TT-1 and TT-2/TT-3, those motions should also be denied as to her.

[3] Codefendant Michael Stewart entered a guilty plea on February 14, 2020. [Doc. 75]. References hereafter to "Defendant Stewart" will be to remaining Defendant Ushery Stewart.

3

3, 2020, the Grand Jury returned a multi-count Superseding Indictment [Doc. 78] charging twelve Defendants—Alim Turner, Ushery Stewart, Ronald Turner, Gilmore, Hounschell, Prater, Billips, Bibbs, Forbes, Curtis, Antoinette Turner, and Cooper—and others with conspiring to distribute methamphetamine, fentanyl, oxycodone, alprazolam, marijuana, buprenorphine, and heroin from July 15, 2018, through November 22, 2019. The Superseding Indictment further charged several Defendants with possession of firearms in furtherance of drug trafficking, conspiracy to money launder, and drug distribution, as well as charged Billips and Bibbs with being a felon in possession of a firearm. The Superseding Indictment alleged enhanced penalties due to prior criminal history for several Defendants and sought the forfeiture of funds. After the filing of the instant motions, but prior to the November 4, 2020 hearing, the Grand Jury returned a Second Superseding Indictment [Doc. 243] on October 8, 2020, adding two Defendants[4]—Cox and Carmley—both of whom are charged in the distribution conspiracy as well as possession of a firearm in furtherance of drug trafficking and drug distribution.

In connection with its investigation, the Government applied for and obtained numerous court orders authorizing various forms of electronic surveillance. These orders include the three subject Title III wiretaps, a pen register/trap and trace [Doc. 231-1 at 19] and phone geolocation [Doc. 213 at 1; 231 at 24].[5] The following Title III orders are challenged by Defendants as noted:

1. TT-1: Wiretap Order for (865) 888-3689; 3:19-MC-5005 TAV (Order dated March 26, 2019)—challenged by Defendant Alim Turner [Doc. 188]; Defendant Prater [Doc. 212]; Defendant Antoinette Turner [Doc. 238 adopting

---

[4] Codefendants Seth Curtis and Christopher Hounschell entered guilty pleas on June 17, 2020 [Doc. 151] and June 29, 2020 [ Doc. 154], respectively.

[5] The Government also used a pole camera and a confidential source during this investigation. [Doc. 231-1 at 22-23].

4

Docs. 188 and 212][6]; and Defendant Billips [Doc. 339 adopting Docs. 188 and 212].

2.  TT-2:  Wiretap Order for (865) 455-0351; 3:19-MC-5007 PLR (Order dated June 5, 2019)—challenged by Defendant Ronald Turner [Doc. 186] and [Doc. 192 adopting Doc. 189]; Defendant Alim Turner [Doc. 188]; Defendant Stewart [Doc. 189]; Defendant Prater [Doc. 212] and [Doc. 213 adopting Docs. 187, 188, and 189]; Defendant Antoinette Turner [Doc. 238 adopting Docs. 188, 189, and 212]; and Defendant Billips [Doc. 339 adopting 186, 188, 189, and 212].

3.  TT-2/TT-3:  Wiretap Order for (865) 455-0351 and (865) 405-8465; 3:19-MC-5010 PLR (Order dated July 26, 2019)—challenged by Defendant Alim Turner [Doc. 188]; Defendant Stewart [Doc. 190]; Defendant Gilmore [Doc. 209]; Defendant Prater [Doc. 212] and [Doc. 213 adopting Docs. 188 and 189]; Defendant Antoinette Turner [Doc. 238 adopting Docs. 188 and 212][7]; and Defendant Billips [Doc. 339 adopting 188, 190, and 212].

A.    **Target Telephone 1 ("TT-1") – March 26, 2019 Application**

The affiant for all three of the wiretap applications is Brandon Stryker, a Task Force Officer with the Federal Bureau of Investigation ("Agent Stryker").  [Doc. 231-1 at 1].  His affidavit for the March 26, 2019 wiretap application ("TT-1 affidavit"), which is 32 pages in length, sought authorization from District Judge Thomas Varlan to intercept the communications occurring over a cellular telephone bearing the number (865) 888-3689, "subscribed to by 'James Black'. . . and believed to be used by MOE [Mahlon Prater]" referred to as TT-1.  [*Id.* at 3].[8]  The named target intercepted included Defendants Alim Turner, Stewart, Gilmore, Carmley, and others known and unknown.  [*Id.* at 3-4].  The communications targeted a drug trafficking conspiracy involving

---

[6] As detailed above, however, the Court has found that Defendant Antoinette Turner alleged a basis for standing to challenge only TT-2.

[7] Again, the Court notes its finding regarding Defendant Antoinette Turner's standing to challenge only TT-2.

[8] The Court notes that Defendant Prater is referred to as "MOE" throughout the affidavit. *See* [Doc. 231-1 at ¶ 5].

5

cocaine, crack cocaine, heroin, and methamphetamine.[9]  [*Id.* at 4].  An order authorizing the interception of the relevant wire communications over TT-1 was signed by District Judge Varlan on the same day Agent Stryker signed the TT-1 affidavit.  *See* 3:19-MC-5005.

Defendant Alim Turner moves to suppress all fruits of the three wiretaps on the grounds that the applications and orders were facially invalid and not necessary under the law for the investigation undertaken by law enforcement in this case.  [Doc. 188 at 1].  He argues that the applications for the wiretaps and the orders authorizing the wiretaps did not follow the statutory requirements of *Omnibus Crime Control and Safe Streets Act of 1968* (codified at 18 U.S.C. §§ 2510-2520) and must be suppressed.  [*Id.*].

With respect to TT-1, Defendant Alim Turner argues the TT-1 affidavit seeking a wiretap on the cellphone of James Black, believed to be used by Defendant Prater, used boilerplate language on necessity and referenced only two attempted traditional surveillance techniques— attempted surveillance of Defendant Prater's vehicle and use of a pole camera—while rejecting techniques such as search warrants, grand jury subpoenas, financial investigations, undercover agents, trash pulls and mail covers.  [Doc. 188 at 7].  Defendant Alim Turner also details that law enforcement did not attempt to surveil Defendant Prater's house because it would be too difficult given that the residents knew each other, unusual vehicle traffic could alert the organization, and physical surveillance provides only limited usable information.  [*Id.*].

---

[9]  The enumerated offenses included: distribution and possession with intent to distribute controlled substances, and the conspiracy to distribute and to possess with intent to distribute controlled substances, including cocaine, crack cocaine, heroin, and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of 21 U.S.C. §§ 843(b); maintaining a premises for manufacture, distribution, or use of controlled substances, in violation of 21 U.S.C. § 856; possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and aiding, abetting, counseling, commanding, inducing, or procuring the commission of any of the named offenses in violation of  18 U.S.C. §2.  [Doc. 231-1 at 4-5].

6

Defendant Prater, stating that he—under the name of "Moe" or "MP" or other alias—is alleged to have participated in intercepted calls and, thus, is an aggrieved person, adds that the affidavit merely speculated that other means of investigation, short of a wiretap, would be unsuccessful. [Doc. 213 at 4]. Defendant Prater states that law enforcement's attempt to follow his vehicle was the only attempt prior to the requested wiretap. [*Id.*]. He asserts this does not meet the requirement of a fact-specific explanation of the need for a wiretap. [*Id.* at 4-5]. Defendant Prater further asserts that the information in all three affidavits supporting the subject wiretaps was based on stale information. [*Id.* at 4]. Specifically, he maintains that the information in the TT-1 affidavit, including text messages from January 2019 and the drug sales involving him and the confidential source ("CS") in December 2018 and January 2019, was stale information for purposes of the March 2019 wiretap application and, thus, not a basis for probable cause. [*Id.*].

Defendant Billips adopts the arguments of Defendant Alim Turner and Prater, stating he is "similarly situated in that calls in which [he] is alleged to have participated were captured by these wiretaps." [Doc. 339 at 1].[10]

The Government responds that the Title III Orders for the three wiretaps complied with 18 U.S.C. §§ 2510 *et seq.*, and the affidavits in support of the Title III Orders demonstrated both probable cause and necessity. [Doc. 231 at 2]. The Government explains that beginning in mid-2018, law enforcement began investigating members and associates of the Unknown Ghost Vice

---

[10] The Court notes that Defendant Billips was named as a target subject and interceptee in TT-2/TT-3, but that the extent of his communications captured by TT-1 and TT-2 is not clear. *See* 18 U.S.C. § 2510(11) (defining an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed"); *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (holding that the defendant had standing to seek to suppress communications because his "conversations were the target of the surveillance" even if he was not always a participant).

Lords gang. [*Id.* at 5]. A part of the investigation included three Title III wiretaps issued for the target telephones—TT-1, TT-2, and TT-3. [*Id.*].

As to TT-1, the Government explains that 865-888-3689 was tapped from March 26, 2019 to April 24, 2019. [*Id.*]. The Government asserts that the TT-1 affidavit showed necessity in demonstrating law enforcement conducted an extensive pre-wiretap investigation and described the counter-surveillance measures by Defendant Prater and others. [*Id.* at 21]. The TT-1 affidavit referenced law enforcement's attempted use of physical surveillance, a pole camera, a CS, consensual recording of the CS's phone, and a pen register/trap and trace. [*Id.*]. It also noted that a subpoena issued for TT-I revealed that the phone was registered under a false name. [*Id.*]. Further, the affidavit demonstrated that law enforcement gave serious consideration to other non-wiretap techniques before applying for a wiretap but noted that these techniques would either not accomplish the goals of the investigation or jeopardize the investigation itself. [*Id.*]

The Government points out that the TT-1 affidavit further represented that despite the pre-wiretap investigation, the goals of the investigation into the drug trafficking organization ("DTO") had not been achieved. [*Id.* at 19]. As delineated in the TT-1 affidavit, the goals of the investigation included:

- the dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers;
- identification of all significant contributors to the DTO;
- collection of evidence sufficient to prosecute all significant contributors to the DTOs;
- identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO; and
- collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators.

[*Id.* at 20-21; Doc. 231-1 at ¶ 29]. Agent Stryker stated that the goals of the investigation could not be achieved by the pre-wiretap techniques for several reasons, including that surveillance had

been attempted on multiple occasions; that the use of GPS phone tracking had been determined insufficient and to present a risk of compromising the investigation; the pole camera utilized on one of the DTO member's houses was insufficient on its own to accomplish the goals; the CS, who made several drug buys from Defendant Prater, stopped responding to law enforcement after February 27, 2019; the consensual recording through the CS's phone was insufficient to achieve the investigative goals; the use of a subpoena for TT-I revealed it was registered to a false name; and the toll history and pen registers/trap and trace information was limited to a list of phone numbers in contact with TT-1, which was of limited value. [*Id*. at 21; Doc. 231-1 at ¶¶ 35, 36, 37, 40, 43 and 47]. The Government notes that the TT-1 affidavit also addressed that other investigative techniques such as interviews, trash pulls and mail covers were considered, but were determined insufficient to accomplish the goals of the investigation and, in some cases, deemed a risk of jeopardizing the investigation. [*Id.*; Doc. 231-1 at ¶¶ 41-42, 44-46].

In response to Defendant Prater's assertion of staleness, the Government submits that the TT-I affidavit demonstrated non-stale probable cause. [Doc. 231 at 12]. It maintains that at the time the wiretap application was sought, only two months had passed since the last recorded drug sale by Defendant Prater, "a ranking member of the Vice Lords criminal street gang," who was a drug trafficker engaged in ongoing criminality. [*Id.*]. The Government argues that a CS made no less than six controlled buys of crack cocaine from Defendant Prater in December 2018 and January 2019, and thus, his repeated drug sales are evidence of "a pattern of ongoing and continuous criminality" such that the passage of time up to the March 2019 wiretap authorization "loses its significance." [*Id.* at 12-13]. Additionally, the affidavit noted that Defendant Prater was communicating with known criminal associates just days before the wiretap authorization was

obtained, including Defendant Alim Turner on March 18, 2019 and another drug dealer on March 21, 2019. [*Id.* at 13].

## B. Target Telephone 2 ("TT-2") – June 5, 2019 Application

Agent Stryker's affidavit for the June 5, 2019 wiretap application ("TT-2 affidavit"), which is 38 pages in length, sought authorization from Chief District Judge Pamela Reeves to intercept the communications occurring over a cellular telephone bearing the number (865) 455-0315, "subscribed to by 'Tyson Brown'... and believed to be used by Alim Turner," referred to as TT-2. [Doc 231-2 at 3]. Additional names were added to the list of target interceptees, including Sean Ramsey. [*Id.* at 3-4]. The affidavit noted the prior March 2019 TT-1 wiretap order and detailed information from that authorization. [*Id.* at 13]. The affidavit also added new information obtained from Defendant Alim Turner's cellphone that was assigned the telephone number for TT-2 and was seized and searched pursuant to a search warrant at the time of his arrest on February 1, 2019, for a probation violation.[11] The affidavit detailed transcribed texts from the seized contents of the cellphone, which included communications with a phone number believed to be utilized by Sean Ramsey, as well as communications with Defendant Stewart and communications with an unknown user regarding the sale of illegal narcotics. [*Id.* at 20–21]. The affidavit went on to explain that after February 1, 2019, Defendant Alim Turner continued to use TT-2 on a new device after law enforcement seized his old device and that TT-2 has had "the same financial liable party, 'Tyson Brown,' and the same billing party, 'Antoinette Turner' (TURNER's mother) between August 31, 2016 to May 09, 2019." [*Id.* at 20]. Lastly, the affidavit identified several additional

---

[11] The TT-2 affidavit states that "[Defendant Alim Turner's] phone was confiscated by Investigator Day of the Knoxville Police Department due to TURNER being a suspect in an on-going murder investigation." [Doc. 231-2 at 14].

target subjects from the DTO and reviewed the telephone records stemming from the pen register/trap and trace from TT-2. [*Id.* at 8-12, 21-23].

Defendant Alim Turner challenges the TT-2 wiretap on the same bases as TT-1, i.e., that the application and order are facially invalid and not necessary under the law for the investigation undertaken by law enforcement in this case. [Doc. 188 at 1]. Specifically, with regard to TT-2, Defendant Alim Turner argues the supporting affidavit is "virtually the same as the March 26 affidavit including the same 18 U.S.C. 2518(1)(c) necessity requirements in which the same 'excuses' why the traditional investigative methods would not meet the goal of the investigation" and fails to explain why a second wiretap order was necessary. [*Id.* at 8-9].

Defendant Ronald Turner, who states he is an aggrieved person and/or a participant in the intercepted TT-2 communications, adds that the affidavit is based on stale information and, therefore, fails to establish a reasonable probability that the TT-2 wiretap will uncover evidence of a crime as of June 5, 2019. He notes that law enforcement gained access to the contents of Defendant Alim Turner's cell phone by means of a search warrant and that the following communications between Defendant Alim Turner and other codefendants were referenced by Agent Stryker along with his impression of the contents: a series of text messages between Alim Turner and Sean Ramsey on November 4, 2018 indicative of a heroin transaction; a series of text messages between Alim Turner and Stewart on November 19, 2018 regarding methamphetamine distribution and firearm discussion; a series of texts on December 6 and 7, 2018 between Alim Turner and Stewart about a drug pick-up in Atlanta, including a discussion about cost per gram; and a text exchange between Alim Turner and an unknown user on January 31, 2019 concerning a 3.5 gram marijuana transaction. [Doc. 187 at 3-4]. Defendant Ronald Turner also notes that Agent Stryker's affidavit provides a "rough analysis of data obtained from a pen register/trap and

11

trace for [TT-2] for the dates of January 14, 2019 through May 28, 2019," referencing 217 calls between Alim Turner and Stewart, with the most recent being May 27, 2019, and 205 text messages between them, with the most recent being May 28, 2019. [*Id.* at 4-5]. He emphasizes that the last substantive text message indicative of drug activity was on the one on January 31, 2019 concerning the 3.5 grams of marijuana—occurring more than four months before the June 5, 2019 affidavit. [*Id.* at 5]. He asserts that the drug transactions discussed in the TT-2 affidavit are sporadic, occurring weeks apart and involving different substances, and thus are not indicative of an ongoing conspiracy for large-scale narcotics distribution. [*Id.*]. He further argues that the TT-2 affidavit does not show Defendant Alim Turner was "entrenched as a drug distributer but was, instead, a drug user." [*Id.*].

Defendant Stewart argues the TT-2 affidavit did not meet the "necessity requirement" and resulted in the illegal recording of his communications. [Doc. 189 at 1]. He asserts that most of the "necessity" provided by Agent Stryker was speculative and conclusory and that the affidavit demonstrates that law enforcement had accomplished extensive investigation without the use of a wiretap. [*Id.* at 2]. Defendant Stewart points out that, among other things, the investigation had already led to the identification of 13 target subjects, uncovered information on the structure and participants of the DTO, and utilized a CS "to identify STEWART'S phone number and conduct consensually monitored emails and a call." [*Id.* at 2-3]. He further points to information in the affidavit showing that law enforcement had a "strong case" to prosecute the DTO without a wiretap, "including direct evidence of drug buys and significant incriminating evidence against TURNER specifically, the leader of the organization." [*Id.* at 8].

Additionally, Defendant Stewart avers that the Government failed to comply with the sealing requirement set out in 18 U.S.C. § 2518(8)(a) and that failure to do so is a separate basis

for suppression. [*Id.* at 9]. He asserts that 18 U.S.C. § 2518(8)(a) requires that immediately upon the expiration of the wiretap authorization order, the intercepted recordings are to be made available to the issuing judge and sealed and that the Sixth Circuit construes "immediately" as meaning within one or two days. [*Id.*]. Here, the order expired on July 5, 2019, and the Government moved to seal the recordings on July 11, 2019. *See* [Doc. 189-2]. Defendant Stewart argues that the Government must provide a "satisfactory explanation" as to why the delay occurred and why it is excusable, or the recordings must be excluded from evidence. [Doc. 189 at 9-10].

As previously noted, Defendant Prater asserts that the information in all three affidavits supporting the subject wiretaps was based on stale information [*see infra.* at 7]; however, he adds no specific detail in support of his claim of staleness with respect to TT-2. [Doc. 213 at 4].

Defendant Ronald Turner adopts [Doc. 192] Defendant Stewart's motion [Doc. 189], and Defendant Prater adopts [Doc. 212] the arguments made by Defendants Alim Turner [Doc. 188], Stewart [Doc. 189], and Ronald Turner [Doc. 187] with respect to the TT-2 affidavit.

Antoinette Turner adopts [Doc. 238] the motions of Defendants Alim Turner [Doc. 188], Stewart [Doc. 189], and Prater [Doc. 212] stating that she is an aggrieved person because the Government intends to use as evidence a recording of a conversation involving her that was obtained as a result of the TT-2 wiretap during June 2019. [Doc. 238 at 1]. The Government responds [Doc. 270] that the applicable wiretaps were based on non-stale probable cause, necessary to achieve the goals of the investigation, and complied with the applicable sealing requirements. The Government's response also details a captured conversation between Defendants Alim Turner and Antoinette Turner on June 28, 2019, which demonstrates Defendant Antoinette Turner's involvement in the conspiracy. [*Id.* at 2–3]. Moreover, as previously detailed, Defendant Billips claims that he is an aggrieved person with respect to TT-2 and seeks [Doc. 339]

13

to adopt Defendant Ronald Turner, Defendant Alim Turner, Defendant Stewart, and Defendant Prater's motions to dismiss [Docs. 186, 188, 189, and 212].[12]

The Government argues in its consolidated response that the Title III Orders for the three wiretaps complied with 18 U.S.C. §§ 2510 *et seq.*, and the affidavits in support of the Title III Orders demonstrated both probable cause and necessity. [Doc. 231 at 2]. The Government explains that 865-455-0315 was tapped from June 6, 2019 to July 5, 2019. [*Id.* at 5]. The Government asserts that the TT-2 affidavit showed necessity in stating that the goals of the investigation were the same as set forth in the application for TT-1 and detailing other investigative techniques already attempted and considered in pursuant of the goals prior to seeking the wiretap. [*Id.* at 23].

Specifically, the Government points out that alternative investigative techniques were mentioned in the TT-2 affidavit as having been seriously considered and discussed, including that detailed physical surveillance was attempted on "multiple occasions" and a pole camera had been used, but neither was able to accomplish the goals of the investigation. [*Id.* at 23]. Further, the affidavit states that the use of vehicle trackers was too dangerous and unlikely to benefit the investigation, noting that Defendant Alim Turner used multiple vehicles and did not have a vehicle registered in his name. The use of a CS as well as the extensive use of pen registers and toll registers were described in the affidavit and noted as having limited benefit in accomplishing the goals of the investigation. The affidavit referenced the consideration of a trash pull, but explained that Defendant Alim Turner frequently stayed at an apartment complex, which would make it difficult to discern from whom or from where the trash originated because trash was disposed of in a community dumpster. Finally, the Government pointed out the explanation in the affidavit

---

[12] *See supra* at 5.

that the financial investigation, which had begun, yielded limited information because DTOs infrequently use the formal banking system, and the investigators had been unable to identify any financial institutions to query. [*Id.* at 23].

As to Defendants' argument that the TT-2 affidavit contained stale information and therefore lacked probable cause, the Government argues that the TT-2 affidavit described the continuing nature of the drug trafficking conduct and gang membership related to the drug trafficking, which defeats the claim of staleness. In particular, the Government notes that the TT-2 affidavit demonstrated that Defendant Alim Turner was "engaged in continual drug trafficking, extending over several months" and that he was using TT-2 to actively facilitate that drug trafficking. [*Id.* at 14-15]. The Government points to Defendant Alim Turner's communications with Defendant Stewart when they were captured discussing drug sales together in November 2018 and maintains that their communications remained constant. The Government points to information in the affidavit detailing that "from November 2018 until right before the wiretap application was approved on June 5, 2019," there was an exchange of "some 750 text messages and over 1000 phone calls." [*Id.* at 15]. The Government argues that to the extent any probable cause had grown stale, it was "refreshed" by the demonstration in the affidavit of constant communications between Defendant Alim Turner and Defendant Stewart, as late as May 28, 2019, which was days before the wiretap was authorized. [*Id.* at 16].

In response to Defendant Stewart's argument concerning the sealing requirement, the Government argues that "[in] this case, 'immediately' sealing the wiretaps was not possible." [*Id.* at 26].[13] The Government explains that while wire taps are monitored in the Eastern District of

---

[13] In its consolidated response, the Government addresses the sealing of TT-1 and argues that it complied with Title III. The Court notes, however, that no specific challenge was raised by any Defendant concerning the sealing of TT-1, so it will not be addressed in the Court's discussion.

Tennessee ("EDTN"), the data is recorded on servers outside of the district. The data, which is oftentimes in large quantities, must be downloaded from the servers onto discs and then" shipped via a commercial carrier to Knoxville, Tennessee for sealing, and then the discs must be sealed by the district court." [*Id.*]. The Government argues that these "logistical realities" are bona fide administrative obstacles, which prevent the Government from "sealing in EDTN—'within one to two days' of terminating the wiretap," and that they demonstrate a "satisfactory explanation" for the delay in sealing. [*Id.*]. The Government notes that the TT-2 wiretap was taken down around midnight on July 5, 2019 and that on that same date, agents requested that the data be downloaded onto discs and forwarded to Knoxville where they were later received on July 10, 2019. The date for sealing was set for the following day—July 11, 2019. [*Id.* at 27-28].

Defendant Stewart filed a reply [Doc. 245] arguing that the Government's explanation for the delay in sealing TT-2 fails to comply with the requirements of 18 U.S.C. §2518(8)(a) because it does not meet the satisfactory administrative obstacle standard.

Additionally, in his reply, Defendant Stewart asserts that he is similarly situated to the defendants who have raised the claim that the TT-2 affidavit relied upon stale information and adds that the most recent information in support of the affidavit was more than 4 months old, and given its staleness, did not support the issuance of the wiretap. [*Id.* at 3-4]. He notes that the last substantive text message indicative of drug dealing was made on January 31, 2019—more than 4 months prior to the date the affidavit was sworn on June 5, 2019. [*Id.* at 4]. Defendant Stewart maintains that the described messages, spaced weeks apart, demonstrate "a sporadic association, rather than an entrenched ongoing criminal enterprise." [*Id.*].

16

**C.** **Target Telephone 2 ("TT-2")/Target Telephone 3 ("TT-3") – July 26, 2019 Application**

Agent Stryker's affidavit for the July 26, 2019 wiretap application for both TT-2 and TT-3 ("TT-2/TT-3 affidavit"), which is 51 pages in length, sought authorization from Chief District Judge Pamela Reeves to renew the interception of communications occurring over TT-2 as well as to initiate interception of communications occurring over pre-paid cellular telephone bearing the number (865) 405-8465, "subscribed to by 'Alim Turner' . . . and believed to be used by STEWART," referred to as TT-3. [Doc 231-3 at 3]. The TT-2/TT-3 affidavit noted the prior March 2019 TT-1 and June 5, 2019 TT-2 wiretap orders and detailed information from those authorizations. [*Id.* at 13-14]. Specifically, the affidavit described several drug related communications discovered on the phone that used the same telephone number as TT-2, when the phone was confiscated from Defendant Alim Turner during his arrest on February 1, 2019 for a probation violation. [*Id.* at 16]. The affidavit also detailed earlier intercepted TT-2 communications between Defendants Alim Turner and Stewart discussing drug trafficking in June 2019 [*Id.* at 17-22] and July 2019 [*Id.* at 28-31] and referenced numerous text messages and calls placed to and from TT-3 discovered through administrative subpoenas and pen register/trap and trace authorizations. [*Id.* at 33-34].

Defendant Alim Turner notes that the TT-2/TT-3 affidavit is identical to the TT-2 affidavit except that a new phone number and additional target interceptees were added. [Doc. 188 at 8]. He argues that the TT-2 and the TT-2/TT-3 affidavits "do not explain why a second and third wiretap orders were necessary given the results which have been obtained." [*Id.* at 9]. Defendant Alim Turner asserts that the Government impermissibly aggregates the necessity from other wiretap applications to show necessity for new wiretaps. [*Id.*].

17

Similar to his challenge to the TT-2 wiretap, Defendant Stewart argues the TT-2/TT-3 affidavit supporting the application for the July 26, 2019 Title III wiretap order did not meet the "necessity requirement" and resulted in the illegal recording of his communications. [Doc. 190 at 1]. He asserts that most of the "necessity" provided by Agent Stryker was speculative and conclusory without specific, factual premises. [*Id.* at 2]. Defendant Stewart further notes that the affidavit itself demonstrated that "law enforcement had accomplished an extensive investigation and had uncovered significant evidence without the use of these further wiretaps." [*Id.* at 3]. Among other things, Defendant Stewart details that the investigation had already resulted in the following progress: the identification of 21 target subjects; information on the DTO's structure and participants; identification of Defendant Ronald Turner, an alleged Vice Lords member and source of supply for the gang; the execution of a federal search warrant on the contents of a box alleged to be destined for Defendant Alim Turner and sent by Defendant Ronald Turner that produced approximately 5 pounds of methamphetamine; and the use of at least one CS and the use of pen register/trap and traces. [*Id.* at 3-4]. Defendant Stewart maintains that the TT-2/TT-3 affidavit "clearly shows that the Government had ample information to prosecute the DTO without use of a[n] additional Title III wiretap." [*Id.* at 10].

Defendant Stewart argues that the affidavit erroneously states that the prior interception of Defendant "Moe" Prater's phone was not helpful in achieving the goals of the investigation, because the prior wiretap uncovered information about Defendant Prater that "could have been used to secure his cooperation against his former confederates." [*Id.* at 5]. He further argues that the affidavit makes a "sweeping conclusion" that "the DTO consists of 'sophisticated criminals' that employ counter-surveillance techniques to avoid law enforcement" without any support other

18

than noting that during the investigation, Defendant Alim Turner had used two different phones and Defendant Stewart had used four. [*Id.*].

Defendant Stewart also asserts that the affidavit gives mere conclusory and speculative reasons why other less intrusive and less extraordinary investigative measures will not be effective, including a lack of detail of efforts to physically surveil the residence at 2828 East Fifth Avenue and an unsupported assertion that a trash pull at the residence would not substantially advance the investigation;[14] the discounting of the use of electronic vehicle surveillance supported only with facts showing that Defendant Alim Turner used a rental car and that not all vehicles were known to law enforcement; the noted use of only one CS when "it is believed there were at least two, and possibly three or more human sources of information;" the limiting of interviews to "persons already arrested or . . . who have sought to cooperate" with no explanation as to why Defendant Alim Turner and Defendant Stewart were not interviewed when they were both arrested during the investigation and the discounting of interviews of other people; the statement that undercover agents have not been able to infiltrate the DTO without detail of any infiltration attempts; the assertion that mail covers would not be successful when "over 2 kilograms of meth" had already been recovered via the USPS and law enforcement was "working closely with the USPS" to determine when other shipments possibly tied to Defendant Alim Turner, Defendant Stewart or other target subjects would be made; the lack of specific facts to support the statement explaining why the use of grand jury subpoenas would harm the investigation and prosecution of the DTO other than statement that "drug traffickers are reluctant to testify and may invoke their Fifth amendment rights;" possible locations for which search warrants could have been issued before

---

[14] The affidavit identified 2828 East Fifth Avenue, Knoxville, TN as a residence used by the DTO for narcotic distribution. [Doc. 231-3 at ¶ 45].

19

seeking a wiretap such as Defendant Alim Turner's girlfriend's apartment and 2828 E. Fifth Avenue; and lack of explanation as to why a thorough financial investigation was not already performed or underway prior to seeking the wiretap. [*Id.* at 5-10]. Defendant Stewart maintains that in addition to having ample information to prosecute the DTO, law enforcement could have used other investigative techniques, short of an additional Title III wiretap, to further expose the crime. [*Id*. at 10].

Similar to his challenge of TT-2, Defendant Stewart additionally avers that with respect to the Order allowing the TT-2/TT-3 wiretap, the Government failed to comply with the sealing requirement set out in 18 U.S.C. § 2518(8)(a) and that failure to do so is a separate basis for suppression. [*Id.* at 11]. He notes that the Order allowing interception expired on August 2, 2019, and the Government moved to seal the recordings on August 9, 2019. [*Id.*].[15] Defendant Stewart argues that absent a "satisfactory explanation" from the Government as to why the delay occurred and why it is excusable, the recordings must be excluded from evidence. [*Id*. at 11-12].

Defendant Gilmore adopts Defendant Stewart's Motion to Suppress (Doc. 190) as to TT-3, stating that he is an aggrieved party, because he is listed in the affidavit as one of the targets of the DTO. [Doc. 209]. Defendant Gilmore also states that calls in which he is alleged to have participated were captured by the TT-3 wiretap and that TT-3 was found in his possession on August 2, 2019 when he was taken into custody. [*Id.* at 1].

As previously discussed, Defendant Prater asserts that the information in all three affidavits supporting the subject wiretaps was based on stale information [*see infra.* at 7]; however, as with TT-2, he adds no specific detail in support of his claim of staleness with respect to TT-3. [Doc.

---

[15] The Government clarifies the timeline of the termination and sealing of TT-2 and TT-3, with TT-3 interception being terminated on August 3, 2019, TT-2 interception being terminated on August 6, 2019, and both wiretaps being sealed on August 9, 2019. *See infra* at 22.

20

213 at 4]. Defendant Prater further adopts [Doc. 212] the arguments made by Defendant Alim Turner [Doc. 188]. Defendant Billips adopts [Doc. 339] the arguments made by Defendant Alim Turner [Doc. 188], Defendant Stewart [Doc. 140], and Defendant Prater [Doc. 212].

The Government responds that the July 26, 2019 TT-2/TT-3 affidavit demonstrated necessity. [Doc. 231 at 24]. The Government notes that the stated goals of the investigation were the same as the June 5, 2019 TT-2 affidavit and that the affidavit described other investigative techniques that were attempted and seriously considered. [*Id.*]. Specifically, it was detailed that the prior interception of TT-2 successfully revealed that Defendant Alim Turner likely was the intended recipient of an intercepted delivery of methamphetamine, but that additional seizures would be needed to acquire evidence of other yet unknown co-conspirators; physical surveillance had gleaned only limited information, explaining Defendants Alim Turner and Stewart frequently drove different vehicles and an attempted June 29, 2019 surveillance effort was difficult because the surveilled vehicle was driven at various speeds—up to 90 mph on the interstate—and drivers were switched; geolocation data for TT-1 and TT-2 did not reveal much about the DTO; and the pole camera used in the investigation had been discovered and posted on social medial by a sister of one of the suspects. [*Id.*].

With respect to Defendants' argument concerning staleness, the Government asserts that the TT-3 affidavit demonstrated that "Defendants Alim Turner and Stewart were drug traffickers engaged in ongoing criminality," pointing out previously captured communications between them concerning drug trafficking occurring during the weeks leading up to the TT-3 application. [*Id.* at 17-18]. In addition, the Government notes information in the affidavit indicating that "TT3 was in contact with another Vice Lords drug Dealer named WOOGIE, later identified as Defendant Hounschell," which occurred on July 10, 2019, just before the TT-3 application. [*Id.* at 18]. The

Government maintains that these were not isolated violation of the law, but evidence of ongoing criminal activity sufficient to defeat a claim of staleness. [*Id.*].

In response to Defendant Stewart's argument concerning the sealing requirement, the Government argues that sealing of TT-2/TT-3 complied with Title III. [*Id.* at 28]. The Government explains that while the wiretap authorization period was to expire on or about August 25, 2019, law enforcement terminated TT-3 on August 3, 2019 and TT-2 on August 6, 2019. On August 8, 2019, the Government contacted Chief District Judge Reeves' chambers and "made the recordings 'available to the judge' to be sealed under her direction," which were then sealed the following day in accordance with chamber's direction. [*Id.*] The Government maintains that because the wiretap discs were made available for sealing within two days of the termination of the wiretap interceptions, the wiretaps were properly sealed in compliance with Title III. [*Id.*].

Alternatively, the Government argues that there was a satisfactory explanation for the brief delay in sealing of the TT-2/TT-3 wiretap. The Government points out that the application to seal mistakenly and incorrectly noted that the interception for both TT-2 and TT-3 had terminated on August 2, 2019, clarifying the timeline of events as follows[16]:

- Friday, August 2, 2019: Law enforcement stopped Defendants Gilmore and Forbes and seized approximately $13,000 as well as TT-3, which was in Gilmore's possession. Due to this development, full staffing for monitoring of wiretap for TT-2 and TT-3 discontinues, but monitoring continues on a reduced level;

- Saturday, August 3, 2019: TT-3 interception terminated;

---

[16] The Government adds that AUSA Quencer, who is assigned to this case, serves as a Lieutenant Commander in the U.S. Navy, and that while under military orders, departed Knoxville during the early morning of August 3, 2019 and arrived in Italy on August 4, 2019. The Government maintains that AUSA Quencer's travel, coupled with misinterpreted communications between law enforcement and the United States Attorney's Office, contributed to the incorrect notation of the August 2, 2019 termination date for the wiretaps reflected in the Government's application for sealing.

22

- Tuesday, August 6, 2019: TT-2 interception terminated and production of TT-2 and TT-3 discs immediately requested by law enforcement;

- Thursday, August 8, 2019: Discs are received in Knoxville and the Court is contacted for sealing; sealing is directed by the Court to occur the next day;

- Friday, August 9, 2019: TT-2 and TT-3 wiretaps are sealed.

[*Id.* at 28-29]. The Government argues that these facts demonstrate that any delay in sealing was brief with no allegations of tampering or resulting prejudice to the defendants and constitute the type of bona fide and satisfactory explanation that has been accepted by the courts. [*Id.* at 30].

Defendant Stewart filed a reply [Doc. 245] arguing that the analysis he put forth with respect to the first TT-2 recording similarly applies to the second recording of TT-2 captured between July 26 and August 3, 2019. [*Id.* at 3]. He maintains that there is no information regarding "the whereabouts, handling, or storage of the data" between August 3 and August 6. [*Id.*].

## II.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend IV. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.*, governs the interception of oral and electronic communications. Interception of oral and electronic communications is generally prohibited, 18 U.S.C. § 2511, and no communication, or evidence derived from such communication, that is intercepted in violation of Title III may be used as evidence at trial, 18 U.S.C. § 2515. However, the Government may apply to a district judge for the interception of a wire or oral communication, and the judge may order, in conformity with § 2518, the interception of oral and /or electronic communications by a federal investigating agency for evidence of drug trafficking crimes. *See* 18 U.S.C. § 2516 (1)(e).

As with search warrants generally, the judge authorizing a wiretap must find "probable cause for belief that an individual is committing, has committed, or is about to commit a particular

offense[,]" such as drug trafficking. 18 U.S.C. § 2518(3)(a); *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir.) (holding that the "basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III"), *cert. denied*, 488 U.S. 821 (1988). The judge must also find "probable cause for belief that particular communications concerning that offense will be obtained through such interception[,]" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[,]" and probable cause to believe that the telephones from which the communications are to be intercepted are being used in connection with the offense or are commonly used by the suspected individual. 18 U.S.C. § 2518(3)(b)-(d).

A valid authorization is presumed unless an "aggrieved person" challenging the electronic surveillance makes a prima facie showing that it was not so authorized. *See* 18 U.S.C. § 2510(11) (defining "aggrieved person" as someone who was a party to any intercepted communication or a person against whom the interception was directed). "Any aggrieved person in any trial, hearing, or proceeding in or before any court . . ., may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—"

> (i)    the communication was unlawfully intercepted;
>
> (ii)    the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii)    the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)

The Court notes that in a case in which law enforcement obtained a search warrant, the defendant bears the burden of proving the constitutional violation. *United States v. Feldman*, 606

F.2d 673, 679 n.11 (6th Cir. 1979). The same is true with regard to Title III wiretaps: "'[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption.'" *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143 (E.D. Tenn. 2009) (quoting *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995)).

Against the backdrop, the Court will turn to the substance of the motions. Defendants seek to suppress all evidence obtained as a result of the interception of TT-1, TT-2 and TT-2/TT-3 based on one or more of the following bases: staleness of probable cause, lack of necessity, and failure to comply with sealing requirements. The Court will address these challenges separately. The Government maintains that all Title III Orders complied with 18 U.S.C. §§ 2510 *et seq.*, and the affidavits in support of the Title III Orders demonstrated both probable cause and necessity and were properly sealed. The Government further argues that even if the Title III affidavits are deemed defective in probable cause and/or necessity, suppression is not appropriate under *Herring v. United States*, 555 U.S. 135, 136 (2009). [Doc. 231 at 12].[17]

## A.    Staleness and Probable Cause

As noted, Defendants Prater and Billips challenge the probable cause basis for TT-1, and Defendants Ronald Turner, Prater, Antoinette Turner, Stewart, and Billips challenge the probable cause basis for TT-2, all on the basis that the information contained in the respective applications

---

[17] As the Court has not found that the Title III affidavits are defective in probable cause or necessity, the Court will decline to address in great detail the Government's arguments regarding the application of *Herring*. The Court notes, however, that in *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007), the Sixth Circuit held that "the good faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III." Courts citing *Rice* have uniformly acknowledged that the Sixth Circuit declined to extend the good faith exception to Title III wiretap cases. *See, e.g.*, *United States v. Barajas*, 710 F.3d 1102, 1110 n.4 (10th Cir. 2013); *United States v. Spann*, 409 F. Supp. 3d 619, 624 (N.D. Ill. 2019); *United States v. Montgomery*, 290 F. Supp. 3d 396, 415 (W.D. Pa. 2018); *United States v. Houston*, No. 1:13-CR-37, 2015 WL 1061971, at *12 n.7 (E.D. Tenn. Mar. 11, 2015).

25

was stale. As previously discussed, while Defendant Prater states that he is challenging all three Title III intercepts on the basis of staleness [Doc. 212 at 4], including TT-2/TT-3, he provides no detail concerning TT-2/TT-3.[18] His motion was adopted by Defendant Billips [Doc. 339], and the Government addressed the issue of staleness with respect to TT-2/TT-3 in its Consolidate Response [Doc. 231 at 17–18].

In reviewing the probable cause determination for a wiretap authorization, the Court must afford the issuing judge's probable cause finding considerable deference. *United States v. Dimora*, 836 F. Supp. 2d 534, 556 (N.D. Ohio 2011) (citing *United States v. Leon*, 468 U.S. 897, 967 (1984) (Stevens, J., concurring in part & dissenting in part)). The issuing judge's "determination on the question of probable cause will not be reversed if the record contains a 'substantial basis for his probable cause findings.'" *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)); *see also Dimora*, 836 F. Supp. 2d at 556 (quoting this passage from *Alfano* and *Lambert*).

"[S]tale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377-78 (6th Cir. 2009). However, "[t]he staleness inquiry depends on the 'inherent nature of the crime.'" *Id.* (quoting *United States v. Spikes,* 158 F.3d 913, 923 (6th Cir. 1998)). The Sixth Circuit has explained that the staleness inquiry involves a fact specific, case-by-case analysis. *Id.* As a result, "the length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *Id.* Stated otherwise, "even if a substantial amount of time had elapsed between a defendant's last reported criminal activity and the issuance of the warrant, the warrant may not be stale." *United States v. Abboud*,

---

[18] Defendant Prater's motion [Doc. 212] was also adopted by Defendant Antoinette Turner [Doc. 238], who has been determined not to have standing to challenge TT-2/TT-3.

438 F.3d 554, 572 (6th Cir. 2006) (citations omitted). In analyzing staleness, the Court is not to solely measure calendar days, but rather is instructed to also consider the following factors: (1) "the character of the crime (chance encounter in the night or regenerating conspiracy?)"; (2) "the criminal (nomadic or entrenched?)"; (3) "the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?)"; and (4) "the place to be searched (mere criminal forum of convenience or secure operational base?)." *United States v. Harris*, 255 F.3d 288, 299 n.3 (6th Cir. 2001) (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998), *cert. denied*, 525 U.S. 1086 (1999)). These factors are circumstances to be weighed in determining whether the information contained in the affidavit was sufficiently fresh to inform the probable cause determination, and not elements that the Government must meet in order to avoid suppression. *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015).

Further, with respect to the staleness test for probable cause, it has been held in this Circuit: (1) that the purpose of the staleness test is not to create an arbitrary time limit; (2) that the existence of probable cause is a function of the inherent nature of the crime; (3) that time is less significant with regard to continuing conduct; and (4) that indicia of criminal activity may remain for some period of time after the defendant's last reported criminal activity. *United States v. Perry*, No. 06-20172-BC, 2007 WL 1017570, at *6 (E.D. Mich. Apr. 3, 2007) (citing *United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995)). In addition, "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001); *United States v. Gray*, 372 F. Supp. 2d 1025, 1040 (N.D. Ohio 2005) (rejecting argument that evidence over six months old was stale, because alleged criminal activity was ongoing), *aff'd*, 521 F.3d 514 (6th Cir. 2008); *see also United States v. Allen*, No. 3:10-CR-00163, 2011 WL 6016888, at *17 (M.D. Tenn. Dec. 2, 2011) (citing *United States v. Urban,* 404 F.3d 754, 774 (3d Cir. 2005)

(finding that evidence supporting wiretap was not stale because "[w]here the facts adduced to support probable cause describe a course or pattern of ongoing or continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance")).

Weighing the salient factors in this case, the Court concludes that the information in all three affidavits was not stale. The affidavits establish that there was evidence of ongoing criminal activity. Specifically, the TT-1 affidavit, which was submitted on March 26, 26, 2019, identified Defendant Prater, the user of the TT-1 target telephone, as a ranking member of a street gang who sold drugs to a CS no less than six times between December 2018 and January 2019, just two months prior to the application for TT-1 being submitted. [Doc. 231-1 at ¶¶ 16(a), 19–20]. The TT-1 affidavit further established that Defendant Prater was continuing to have communications with known criminal associates just days before the wiretap application. [Doc. 231-1 at ¶¶ 26–28].

Similarly, the TT-2 affidavit established much more than an isolated drug transaction. Paragraph 22 of the TT-2 affidavit relates that a phone belonging to Defendant Alim Turner was seized on February 1, 2019, and that pursuant to that seizure, a search warrant was executed, allowing law enforcement to withdraw several text messages recited in the affidavit. [Doc. 231-2 at ¶ 22, 23–25, 27]. The challenging Defendants focus on several text messages occurring some seven months prior to the TT-2 application: a discussion between Defendant Alim Turner and Shawn Ramsey dealing with heroin and possibly marijuana on November 4, 2018 [*Id.* at ¶ 23]; a conversation between Defendants Alim Turner and Stewart regarding some quantity of methamphetamine and a firearm [*Id.* at ¶ 24]; and a continuing conversation on December 6 and 7, 2018 between Defendants Alim Turner and Stewart discussing a drug pickup in Atlanta, Georgia

[*Id.* at ¶ 25].  Defendants assert that the last substantive text message indicative of drug activity occurred on January 31, 2019, which was four months prior to the TT-2 affidavit.  While Defendants maintain that the lack of captured communications indicating drug activity during the four-month period between January 31 and June 5, 2019 is a significant indicator of the staleness of the information that was relied upon, the Court disagrees.

Both the TT-1 and TT-2 affidavits established that there was ongoing criminal activity during the later part of 2018 and continuing well into 2019. With regard to TT-1, District Judge Varlan was presented with evidence of ongoing criminal activity involving repeated drug sales by the user of the target telephone through at least six controlled buys in December 2018 through January 2019, just a couple of months prior to the TT-1 application.  In addition, there was also data obtained through the use of administrative subpoenas as well as pen register/trap and trace for the dates from January 9, 2019 to March 21, 2019[19] referencing some 5,580 calls and 6,960 texts placed to and from target telephone one, with 416 calls and 141 texts associated with a known drug distributor and 49 calls occurring with a known member of the conspiracy, also known to be a distributor of narcotics.  *See* [Doc. 231-1 at ¶¶ 25–28].

With respect to TT-2, Chief District Judge Reeves was presented with evidence indicating that Defendant Alim Turner was engaged in a pattern of drug trafficking, and specifically, that he was associating with Defendant Stewart in this criminal activity.  First, the TT-2 affidavit included information that a CS identified Defendant Alim Turner as a source of supply for marijuana and other drugs, including crack cocaine and that he received pounds of marijuana via the mail system.

---

[19] The TT-1 affidavit establishes that through the use of administrative subpoenas, the Government obtained the call and text message history for TT-1 from January 9, 2019 through January 22, 2019.  [Doc. 231-1 at ¶ 24].  Subsequently, on January 22, 2019, a pen register/trap and trace device was authorized on TT-1, providing with the Government with call and text message history from January 22, 2019 through March 21, 2019.  [*Id.*].

29

[Doc. 231-2 at ¶ 21]. Next, as detailed above, several text messages captured through a search warrant of Defendant Alim Turner's phone were set out in the TT-2 affidavit, including several exchanges in November and December 2018 with Defendant Stewart communicating about drug supplies and sales as well as the purchase of a firearm. [*Id.* at ¶¶ 23-25, 27]. In addition, the information included a text message as recent as January 31, 2019 of Defendant Alim Turner arranging a drug sale to an unknown person. [*Id.* at ¶ 27].

The TT-2 affidavit also presented Chief District Judge Reeves with information detailing that from November 2018 until just before the wiretap application was approved June 5, 2019, there occurred some 750 texts and over 1000 phone calls between Defendants Alim Turner and Stewart. [*Id.* at ¶¶ 31-36]. While Defendants assert that these communications are not indicative of criminal activity, the Court finds that they demonstrate a recurring pattern of multiple connections among the texts and phone calls, between and among members of the conspiracy, sufficient to support a finding that there was a likelihood that crime was being furthered. *See United States v. Alfano,* 838 F.2d 158, 162 (6th Cir. 1988) (finding that a "recurring pattern of multiple connections among the phone calls, between and among recognized members of the conspiracy, and connected to . . . the key defendant in this case" created a fair probability that intercepting those calls would reveal evidence of a crime).

The TT-2/TT-3 affidavit likewise provided Chief District Judge Reeves with evidence demonstrating that the criminal activity was continuing, detailing ongoing communications between Defendant Alim Turner and Stewart, as well as communications between Defendant Alim Turner and others, including Defendants Hounschell and Billips, concerning drug trafficking. [Doc. 231-3 at 17-34]. The TT-3 affidavit specifically noted numerous calls made by Defendant Hounschell to Defendant Alim Turner over TT-2 to discuss a narcotics transaction, with the most

30

recent call occurring on July 10, 2019, just a few weeks prior to the TT-2/TT-3 application. [*Id.* at 34].

Allegations of ongoing criminal activity, as here, "will generally defeat a claim of staleness." *United States v. Greene*, 250 F.2d 471, 481 (6th Cir. 2001). Furthermore, each affidavit indicates that the criminal activity is much closer to a regenerating conspiracy than occasional drug sales. *See United States v. Young*, 847 F.3d 328, 346 (6th Cir. 2017) (finding the information in the affidavit not stale due to evidence of a regenerating conspiracy where affidavit identified defendant as a ranking member of a street gang who supplied cocaine to gang members and wiretaps identified a number of locations being used to store drugs and cash, including his home); *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (finding the information in the affidavit not stale due to evidence that the narcotics trafficking was continuous and ongoing, including twelve controlled buys from the dwelling and a tip from an informant that a package was sent from the residence to a known drug dealer less than one month prior to the execution of the warrant).

Although Defendants urge the Court to adopt more of an isolated event-by-event analysis of the affidavits supporting each application, the Court must analyze the affidavits as a whole in a practical and common sense manner, based on the totality of the circumstances. Based on the totality of the evidence presented in the affidavits, coupled with the required due deference to the issuing judge, the undersigned concludes that each application was supported by non-stale probable cause.

## B.    Necessity

As previously summarized, Defendants Alim Turner and Prater assert the TT-1 affidavit in support of the first wiretap, which was authorized on March 26, 2019, failed to provide a sufficient statement regarding the necessity for a wiretap. Defendant Billips adopt their arguments. They

31

claim the affidavit contains merely boilerplate language of necessity and speculates as to why other means of investigation would prove unsuccessful.  With respect to the TT-2 affidavit in support of the second wiretap, which was authorized on June 5, 2019, Defendants Alim Turner and Stewart argue that is also failed to establish the requisite "necessity" for the surveillance, adding that the affidavit did not explain the need for a second wiretap and even demonstrated law enforcement's ability to accomplish an extensive investigation without the use of a wiretap.  Defendants Ronald Turner, Prater, Antoinette Turner and Billips adopt this same position as to TT-2.  As to the TT-2/TT-3 affidavit supporting the third wiretap order, which was authorized on July 26, 2019, Defendant Alim Turner maintains that it impermissibly aggregated the necessity from the two previous wiretap application to show necessity for the new wiretap.  In addition, he and Defendant Stewart assert that the TT-2/TT-3 affidavit does not explain why the new wiretap order was necessary given that the results already obtained in the investigation, which uncovered significant evidence without the use of further wiretaps.  These arguments are adopted by Defendants Prater and Billips.

"In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017) (quoting 18 U.S.C. § 2518(1)(c)).  "This provision, commonly referred to as the 'needs statement provision,' was designed to insure that wiretapping is not resorted to in a situation where traditional investigative techniques 'would suffice to expose the crime.'" *Id.* (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)).  "'[W]hat is

needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation.'" *Id.*

While the necessity requirement protects against the use of a wiretap as the initial step in an investigation, there is not a requirement that the "government . . . prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano,* 838 F.2d at 163 (citing *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985)). Rather, as the Sixth Circuit has stated:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate. While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be … inadequate compliance with the statute.

*United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). The Sixth Circuit has further declared that the Title III necessity requirement "do[es] not require proof of the absolute impossibility of all other means. Instead, a reasonable statement of the consideration or use of other investigative means is adequate . . . ." *Alfano*, 838 F.2d at 164.

"Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *Rice,* 478 F.3d at 710. However, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143 (E.D. Tenn. 2009) (citing *United States v. Quintana*, 70 F.3d 1167,1169 (10th Cir. 1995)).

In Agent Stryker's 32-page affidavit supporting the application for the March 26, 2019 Order authorizing the wiretap of TT-1, he set out his qualifications as a law enforcement officer and affiant, the grounds for seeking the wiretap authorization, and the fact that no prior applications for wiretaps has been sought related to TT-1 or any of the target subjects. [Doc. 231-1 at 1-7, 12]. The TT-1 affidavit then detailed the background of the drug trafficking organization under investigation [*Id.* at 7-12], including the information already known to law enforcement uncovered through conventional means, such as the use of a CS, who provided information about the DTO and made controlled purchases of crack cocaine from Defendant Prater. [*Id.* at 12-17]. The agent attested that while the use of confidential sources had been successful, the information learned about the DTO was limited to the seller of the drugs and provided no information about the DTO's supplier. [*Id.* at 23]. He detailed the consensual recording of CS's phone, but noted it provided no information about the source of supply, co-conspirators, or breadth of the DTO. He further explained that CS had stopped responding to agents and was no longer considered to be cooperating. [*Id.* at 22-24].

Agent Stryker included an explicit discussion of other alternative techniques of investigation, namely: surveillance (vehicle trackers, geolocation information, physical surveillance, and pole cameras); undercover agents; trash pulls; mail covers; grand jury subpoenas, subject interviews, search warrants, phone toll records, and financial investigation, noting that each method has either been tried and failed or of limited success, appeared unlikely to succeed, or considered too dangerous to employ. [*Id.* at 20-22, 24-28]. In discussing surveillance, the agent detailed that physical surveillance had been tried on multiple occasions, but with little success. For example, he explains that in attempting surveillance at Defendant Prater's residence, he knows from experience that it is difficult to conduct live surveillance in that particular area because all of

34

the residents are familiar with one another, making frequent, unfamiliar vehicles in the area obvious to the DTO. [*Id.* at 20]. He detailed a recent attempted surveillance of the area on March 5, 2019, when it appeared Defendant Prater left his home in a vehicle, which was then observed traveling at a high rate of speed and making "several abrupt left and right turns indicative of counter-surveillance measures, possibly because they didn't recognize the vehicle law enforcement was using to conduct the surveillance." [*Id.* at 21].

Agent Stryker stated that the use of vehicle tracking devices had been contemplated, but for several reasons, they were not used, including that not all of Defendant Prater's vehicles had been specifically identified; the risk of detection in installing, using, maintaining, or removing such devices outweighed the potential value, especially given the setting of Defendant Prater's residence, as previously explained; and the value of such a device was limited to learning only general movements of a targeted vehicle, which would not allow agents to determine the source of supply for the drugs. [*Id.*]. The consideration of using GPS phone tracking was also noted, with Agent Stryker explaining that the DTO appeared to be aware of the threat of detection and had actively taken measures such as dropping phones, frequent check-ins amongst co-conspirators, weekly "AVLN" meetings). [*Id.* at 21-22]. Stryker stated that while GPS trackers can be helpful, learning movements of co-conspirators alone does not tell law enforcement who they are meeting with, what they are speaking about, what they are doing, or how the organization operates and that if phones are turned off or no calls are made, there is no means of tracking the user's whereabouts. [*Id.* at 22].

Law enforcement had attempted the use of a pole camera in the investigation. Agent Stryker stated that in using the device, law enforcement was able to "observe cars in [the] area of the house including the capability to read license plates when needed, and sometimes, the

capability to identify a person standing on the street or in the direct line of sight of the camera." [*Id.*]. He further stated, however, that such identifying information, while helpful, would not provide specific enough information to penetrate or dismantle the DTO's operations. Agent Stryker added that in his experience, experience "gang members and criminals can sometimes identify pole cams and avoid the line of sight during their operation." [*Id.*].

In addition to surveillance, Agent Stryker described other traditional investigative techniques that were attempted or considered before filing the TT-1 application. For instance, with regard to interviews, he stated that they had been limited to persons who had already been arrested or who had sought to cooperate with law enforcement, because of the risk that individuals would alert the co-conspirators about the investigation, causing them to flee or destroy evidence. [*Id.* at 23]. Stryker described the use of subpoenas to learn the subscriber information of telephones involved in the investigation, which yielded little information, noting that TT-1 was registered to a false name. [*Id.* at 25]. Then, he addressed interviews of the subjects or their known associates, stating that they would not provide sufficient information about the DTO, because responses would not be completely truthful in order to divert the investigation with false leads, and "[m]ost concerning, the interviewed subjects would likely alert other DTO members, thereby compromising the investigation and resulting in the possible destruction or concealment of evidence or potentially placing cooperators in danger." [*Id.* at 26]. Next, Stryker explained that search warrants would "in all likelihood, not reveal the entire scope" of the investigation, and in any event, were premature at that point in the investigation. [*Id.*]. He stated that there would likely be probable cause to obtain search warrants in the future, but at the current stage of the investigation, too little was known about the DTO. [*Id.*].

Finally, Agent Stryker detailed several other investigative methods that were considered but deemed insufficient in accomplishing the goals of the investigation, including undercover agents, trash pulls, mail covers, grand jury subpoenas, phone toll records, and a financial investigation. He explained the reasons for not undertaking these measures as follows: *undercover agents* could not successfully be introduced to Defendant Prater because he is highly suspicious and largely deals only with individuals he knows [*Id.* at 24]; *trash pulls* would not substantially advance the investigation because, based on his training and experience, it is unlikely the examination of discarded trash would reveal the scope of the overall organization or provide information about drug suppliers or distributors [*Id.*]; *mail covers* would not be beneficial in identifying DTO co-conspirators or sources of supply because agents have received no information to suggest that the DTO utilized the mail to ship or distribute crack cocaine [*Id.* at 25]; *grand jury subpoenas* would not be successful in achieving the goals of the investigation because co-conspirators would most likely invoke their Constitutional rights against self-incrimination and cause the targets to become more cautious in their activities, flee or threaten lives of confidential sources or cooperators [*Id.*]; *phone toll records* had been used and continued to be gathered for TT-1 as well as other phones used by DTO members, but only served to confirm contacts between phones without providing content of conversations, which was significant for the investigation of a criminal conspiracy [*Id.* at 47]; and the *financial investigation* was "in its infancy" with no specific financial institutions having been identified that are being used by the DTO, and based on training experience "street level gang and distribution organizations like this one infrequently use the formal banking system." [*Id.* at 28].

The Court has considered Defendants' arguments that the reference to only two attempted traditional surveillance techniques—Defendant Prater's vehicle and a pole camera—along with

speculation that other means of investigation, short of a wiretap, constitutes an insufficient showing of necessity. However, contrary to the contentions of Defendants, including that the TT-1 affidavit used boilerplate language on necessity, there is sufficient information set forth by Agent Stryker to comply with the necessity requirements of Title III. *See* 18 U.S.C. § 2518(1)(c). The wiretap order signed by District Judge Varlan on March 26, 2019 is presumed proper and Defendants have not satisfied their burden of overcoming this presumption. The TT-1 affidavit set forth specific investigative goals the wiretaps were designed to further and identified the targets whose communications were expected to be intercepted. And, while the affidavit included some generic language, it does not consist solely of boilerplate. As discussed, the TT-1 affidavit describes the noted physical surveillance and describe the difficulties in attempting to surveil Defendant Prater's vehicle and limitations with the pole camera surveillance. It detailed the information that had been obtained through a CS and explained that the source had stopped cooperating with law enforcement. The affidavit described the problems with trying to use an undercover agent to infiltrate the DTO, as well as noted the limited information obtained from subpoenas for subscriber information on various phones. Other methods of investigation, including vehicle trackers, geolocation, grand jury subpoenas, search warrants, trash pulls, mail covers, subject interviews, and a financial investigation, are discussed but deemed too dangerous or unlikely to be useful based on the affiant's experience.

An affidavit's partial reliance on "'statements that would be equally applicable to almost any . . . case [of this kind] does not render the affidavit insufficient' so long as there is 'information about particular facts . . . which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.'" *United States v. Wright*, 635 F. App'x 162, 167 (6th Cir. 2015) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)) (omissions and

38

alteration in original). As the Sixth Circuit has instructed, the Court need not conduct "a hyper-technical and speculative analysis" of whether other investigative techniques might have been effective, but instead should examine the affidavit using "a practical and common sense" approach. *Id.* at 167-68 (6th Cir. 2015) (quoting *United States v. Branch*, No. 5:12 CR 286, 2013 U.S. Dist. LEXIS 39817, at *33 (N.D. Ohio Mar. 13, 2013)). In so doing, the Court may rely on the affiant's opinions, based on his experience, that those techniques were "unlikely to succeed if tried." *Id.* at 167 (quoting *Landmesser*, 553 F.2d at 20). The Sixth Circuit has also observed that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) (quoting *Landmesser*, 553 F.2d at 20). That is the case here, where drug trafficking activity appears to have been frequently coordinated through phone and text communications.

While the TT-2 application sought a wiretap for a different phone—that used by Defendant Alim Turner—Defendants assert that the supporting affidavit is virtually the same as the TT-1 affidavit, including the language regarding other investigative methods, and argue that the need for a second wiretap was not explained. As an initial matter, the Court notes that additional names were added to the list of target subjects and interceptees and that the affidavit noted the prior March 2019 TT-1 interception and detailed information from that authorization. [Doc. 231-2 at 3, 4, 24-25]. With respect to the need for the wiretap, the TT-2 affidavit explained that the prior interception of TT-1 was not helpful in achieving the goals of the investigation, because Defendant Prater, whose phone was the subject of TT-1, was "kicked out the gang" shortly after the wiretap interception commenced. [*Id.* at 24–25]. It was noted that while the TT-1 interceptions were somewhat helpful in capturing some drug sale communications, they did not accomplish the goals

of the investigation as law enforcement learned nothing about Defendant Alim Turner, the alleged DTO gang leader or the DTO's suppliers. [*Id.*].

As pointed out by Defendants, the TT-2 affidavit does discuss some of same alternative investigative techniques laid out in the TT-1 affidavit, such as the use of a CS and prior use of a pole camera. However, Agent Stryker supplemented information concerning certain techniques, referencing case specific facts regarding Defendant Alim Turner. For instance, he explained that agents had attempted to conduct physical surveillance at the residence of Defendant Alim Turner's girlfriend, located at 1205 Cassell Valley Way Apt #303, but that it was unsuccessful due to the small size of the parking lot and frequency with which residents came and went from the apartment complex. [*Id.* at 26]. In discussing the use of vehicle trackers, the affidavit referenced that Defendant Alim Turner used multiple vehicles and did not have a vehicle registered in his name. [*Id.* at 26-27]. Additionally, with regard to the consideration of trash pulls, the affidavit noted that Defendant Alim Turner frequently stayed in an apartment complex where the trash was dumped into a community dumpster, making it difficult to discern from whom or where the waste originated. [*Id.* at 30]. Thus, although the TT-2 affidavit cited the same reasons given in the TT-1 affidavit for some or most of the traditional investigative methods being insufficient, those reasons were still applicable at that stage in the investigation and were sufficiently explained as discussed above.

With respect to the TT-2/TT-3 affidavit, Defendants similarly argue that the Government impermissibly aggregates the necessity from other wiretap applications to show necessity for new wiretaps. Defendants maintain that the TT-2/TT-3 affidavit is identical to the TT-2 affidavit except that a new phone number and additional target interceptees were added. They also argue that given

the results which already had been obtained, the TT-2/TT-3 affidavits do not explain the need for extending the interception of TT-2 or seeking the TT-3 wiretap.

As detailed, the TT-2/TT-3 application sought to renew the electronic interception of Defendant Alim Turner's communications (TT-2) and commence the interception of Defendant Stewart's communications (TT-3). In addition to describing the history of the investigation, Agent Stryker added information discovered through the earlier TT-2 wiretap, including that Defendant Alim Turner was intercepted discussing narcotics transactions with several individuals, including his brother, Defendant Ronald Turner. [Doc. 231-3 at 36]. He further noted that the prior TT-2 interception revealed that Defendant Alim Turner was the intended recipient on an intercepted shipment of methamphetamine, and stated that further interception was needed to make additional seizures and acquire more evidence of the involvement of other unknown co-conspirators. [*Id.*].

While again, some of the same information was outlined concerning other investigative techniques and reasons for their insufficiency with respect to the subject investigation, Agent Stryker supplemented the affidavit with information that had been learned since the prior interceptions. For example, with respect to utilizing search warrants, he noted that a federal search warrant had been obtained for the referenced postal package that included approximately five pounds of methamphetamine. [*Id.*]. He also stated that law enforcement was continuing to work with the postal service in an effort to identify other shipments sent to locations linked to targets who were subjects of the investigation. [*Id.* at 43].

With respect to physical surveillance, Agent Stryker described an attempted surveillance operation on June 29, 2019, where agents attempted to follow Defendants Alim Turner and Stewart along with another individual traveling in a car together. [*Id.* at 38]. He stated that surveillance was unsuccessful due to counter-surveillance measures employed, including that Defendant Alim

41

Turner was the initial driver of the vehicle and drove at various speeds within the same speed limit, frequently driving through densely populated areas, and later, Defendant Stewart switched seats with Turner, becoming the driver of the vehicle and drove on the interstate between 65 and 90 m.p.h. [*Id.*]. Agent Stryker noted that surveillance had not been successful due to the fact that Defendant Alim Turner and Stewart were known to drive numerous vehicles, and agents had not been able to identify a vehicle that either drove consistently for the distribution of drugs. [*Id.* at 39].

Finally, while the previous affidavits had described the difficulty with surveillance using a pole camera, including the risk that it could sometimes be identified, Agent Stryker supplemented the TT-2/TT-3 with a recent example detailing that "photos of the aforementioned pole camera were shared on social media by a sister of one of the suspects found inside 2828 E. Fifth Avenue immediately following a search warrant at the residence." [*Id.* at 40]. Even with this supplemental information and acknowledgment that progress had been made through the interception of TT-2, Agent Stryker explained that the goals of the investigation had not been accomplished as Defendant Alim Turner's sources of supply, co-conspirators, and the methods used by the DTO were still not fully known and identified.

Given the above review, the Court finds that Defendants have not satisfied their burden of overcoming the presumption that the wiretap authorization orders signed by District Judge Varlan and Chief District Judge Reeves are proper. "[A] purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . inadequate compliance with the statute." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). That is not what we have here. In this case, all three affidavits show that several other investigative techniques were utilized

42

or seriously considered before the wiretap application was made, and further investigation was conducted prior to each subsequent application. This is all the caselaw requires. *See id.* Although law enforcement may not have exhausted all available alternative investigative techniques before applying for a wiretap, it was not required to do so.

While Defendants maintain that Agent Stryker should have given more factual detail as to why he considered certain other investigative techniques as not useful or unlikely to succeed, he stated that his reasoning was based on his training and experience and the "prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried." *Id.* The affidavits in support of the wiretap applications amply established that the Government diligently considered, and tried, alternative conventional means of investigation, and that those other means were unlikely to achieve the ends of the investigation of fully exploring the DTO's activities and accomplishing the goals of the investigation. As such, the wiretap applications were not "the initial step in [the] criminal investigation." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (citations and internal quotation marks omitted).

Moreover, the affidavits provide a full and complete statement of the investigative procedures attempted, and whether they reasonably appeared to be unlikely to succeed or too dangerous, in accordance with 18 U.S.C. § 2518(1)(c). As detailed throughout the Opinion, the Court's review of the affidavits in support of the wiretap applications demonstrates that law enforcement gave "serious consideration to non-wiretap investigative techniques prior to applying for the authority to wiretap." *United State v. Kelley*, 596 F. Supp. 2d 1132, 1143 (E.D. Tenn. 2009); *see, e.g.*, *Rice*, 478 F.3d at 710. Taking into consideration the great deference to be given the issuing judge's decision, the court finds that substantial facts demonstrating that the

government met the necessity requirement was presented to both District Judge Varlan for TT-1 and to Chief District Judge Reeves for TT-2 and TT-2/TT-3.

### C. Sealing

As a final basis for suppression, Defendants argue that TT-2 and TT-2/TT-3 were not sealed "immediately" in accordance with 18 U.S.C. § 2518(8)(a). Defendant Stewart raised the challenge to TT-2, and this argument was adopted by Defendants Ronald Turner, Prater, Antoinette Turner, and Billips. Defendant Stewart also raised the challenge to TT-2/TT-3, which was adopted by Defendants Gilmore and Billips.[20]

As previously detailed, the TT-2 wiretap was taken down at approximately midnight on (Friday) July 5, 2019, and the case agents requested that the wire contents be downloaded onto discs that same date and forwarded to Knoxville, Tennessee for sealing. Upon receipt of the discs in Knoxville on July 10, 2019 (Wednesday), the Government requested an appointment with the Court for sealing, and the recordings were sealed on July 11, 2019 (Thursday). [Doc. 231-5]. The time period between the termination of the wire and tendering of the recordings to the Court for sealing was five days, which included an intervening weekend.

With respect to the TT-2/TT-3 wiretaps, the Government explained that the TT-3 interception terminated on Saturday, August 3, 2019, and that the TT-2 interception terminated on Tuesday, August 6, 2019. That same date, law enforcement requested production of the TT-2/TT-3 discs, which were received in Knoxville on Thursday, August 8, 2019. The Court was contacted for an appointment to seal the recordings on August 8, 2019, and the sealing occurred on Friday,

---

[20] The Court notes that Defendants Prater and Antoinette Turner merely adopted the arguments made by Defendant Alim Turner with respect to TT-2 and TT-2/TT-3. However, Defendant Alim Turner did not challenge whether TT-2 or TT-2/TT-3 were properly immediately sealed or adopt Defendant Stewart's motions.

44

August 9, 2019. [Doc. 231-6 at 4-5]. The time period between the termination of the TT-2/TT-3 wiretaps and tendering of the recordings to the Court for sealing was two weekdays for TT-2 and five days for TT-3, which included an intervening weekend.

The Title III sealing requirement set out in 18 U.S.C. § 2518(8)(a) requires that immediately upon the expiration of the wiretap authorization order, the intercepted recordings are to be made available to the issuing judge and sealed. Section 2518(8)(a) provides in pertinent part as follows:

> Immediately upon the expiration of the period of the order [authorizing the interception of wire or oral communications], or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions ... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518. "Immediately" is understood as meaning "within one or two days." *United States v. Wilkinson*, 53 F.3d 757, 759 (6th Cir. 1995) (citing *United States v. Pedroni,* 958 F.2d 262, 265 (9th Cir. 1992)). Where a recording of an intercepted conversation is not sealed "immediately" upon expiration of the authorizing order, the "satisfactory explanation" language of § 2518(8)(a) requires that the government explain both the delay and why it is excusable, i.e., "satisfactory." *Id.* (citing *United States v. Ojeda Rios*, 495 U.S. 257, 265 (1990)).

"The purpose of the sealing requirement is to help protect the authenticity and reliability of the tape recording and to limit 'the Government's opportunity to alter the recordings.'" *Id.* (quoting *Ojeda Rios,* 495 U.S. at 263). "The longer the delay before a tape is sealed, the greater the danger of adulteration." *Id.* (citing *United States v. Mora,* 821 F.2d 860, 868 (1st Cir. 1987)). "The import of protecting the integrity of a tape recording lies in avoiding any prejudice to the defendant." *Id.* at 760.

According to the Government, the process of downloading the wire contents onto discs and forwarding them to Knoxville for sealing by the Court as described in the sealing applications is the reason for any delay between the time a wiretap was terminated and when the discs are tendered to the court for sealing. The Government explained that while the wire tapes are monitored locally, the data is recorded on servers outside of the District, which must be downloaded onto discs and then shipped via a commercial carrier to Knoxville for sealing.

The Court concludes that the Government has provided a satisfactory explanation for the brief delay in sealing of the July TT-2 and the August TT-3 wiretaps. The administrative processing, as explained, prevented the Government from sealing the data discs within one to two days of the respective wiretap terminations. *See United States v. Carson*, 969 F.2d 1480, 1488 (3d Cir. 1992) (recognizing that "relatively short delays necessitated by the process required to comply with the provisions" of Title III, or "administrative delays for want of a better term" are "justifiable government delays under the statutory scheme"); *see, e.g.*, *United States v. Washington*, 887 F. Supp. 2d 1077, 1090 (D. Mont. 2012) (finding the Government provided a satisfactory explanation for a four-day delay between the termination of electronic surveillance and a sealing order where the intercepted communications were stored on a central server in Colorado, burned onto discs, shipped to Montana, and the recordings were sealed the day after receipt), *adhered to on reconsideration*, No. CR 11-61-M-DLC, 2012 WL 4602838 (D. Mont. Oct. 2, 2012). With respect to the August TT-2 wiretap, the Court finds that the sealing took place on the second business day after the termination of the wiretap interception on August 6, 2019 and was therefore "immediate" within the meaning of the statute.

In addition to the Government's explanation of the administrative cause for the delay in sealing, the Court notes that the calculation of the period that elapsed between the termination of

46

July TT-2 and the August TT-3 wiretaps and the presentment of the respective discs for sealing, included an intervening weekend. In removing the weekend days from the calculation, the periods of delay at issue were three business days. *United States v. Rice*, No. CRIM.A. 3:04-CR-83-R, 2005 WL 2180019, at *2 (W.D. Ky. Sept. 9, 2005) (noting that although this issue was not addressed by the Sixth Circuit in *Wilkinson*, "[t]he Court agrees with the Second Circuit that weekend days should not be counted when calculating the time elapsed between the termination of a wiretap authorization and its sealing") (citing *United States v. McGrath*, 622 F.2d 36, 42 (2d Cir. 1980); *United States v. Vazquez*, 605 F.2d 1969, 1278 (2d Cir. 1979)); *see, e.g.*, *United States v. Mastronardo*, 987 F. Supp. 2d 545, 558 (E.D. Pa. 2013) ("Sealing after a six-day delay is immediate when the delay includes an intervening weekend."); *United States v. Riley*, No. 2:18-CR-50, 2019 WL 2093248, at *9 (S.D. Ga. Apr. 19, 2019) ("Weekends need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration.") (collecting cases, including *Rice*), *report and recommendation adopted by*, 2019 WL 2090686 (S.D. Ga. May 13, 2019). Given the Government's reasonable explanation, the Court concludes that Defendants' claims that the July TT-2 and August TT-3 wiretaps should be suppressed is without merit.

The Court further notes that, in the face of the Government's satisfactory explanation for the sealing delay due to the administrative process, Defendants neither claimed that the discs were tampered with or otherwise altered nor identified any prejudice which they have suffered as a result of the delays. At most, Defendants asserted that there is no information regarding "the whereabouts, handling, or storage of the data" between August 3 and August 6 for TT-3, but they did not suggest that the Government's explanation was inaccurate in any significant respect. [Doc. 245 at 3]; *see Wilkinson*, 53 F.3d at 760 (finding "no basis exists for inferring any prejudice to

Wilkinson" and "[t]here is no evidence of tampering . . . and there is no indication that the government's delay in sealing the tape was either a deliberate flouting of the statutory requirement or an effort to gain tactical advantage"); *see, e.g.*, *United States v. Mayfield*, No. 2:16-CR-009-RWS-JCF, 2017 WL 9477736, at *26 (N.D. Ga. Feb. 28, 2017) (collecting cases to detail several "factors courts have considered in determining whether the Government's explanation for a sealing delay is satisfactory," including "whether there is any evidence that the government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings, i.e., whether the government acted in bad faith"), *report and recommendation adopted by*, 2017 WL 4330369 (N.D. Ga. Sept. 29, 2017).

## III. CONCLUSION

Accordingly, the undersigned respectfully **RECOMMENDS**[21] that:

1. Defendants' Motions to Adopt [**Docs. 192, 209, and 339**] be **GRANTED**, with the exception that Defendant Antoinette Turner's Motion to Adopt [**Doc. 238**] be **GRANTED IN PART and DENIED IN PART**; and

2. Defendants' Motions to Suppress [**Docs. 186, 188, 189, 190, and 212**] be **DENIED**.

Respectfully submitted,

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

[21] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

48