UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| ALIM TURNER, | ) | No.: | 3:19-CR-151-TAV-DCP-1 |
| USHERY M. STEWART, | ) | | 3:19-CR-151-TAV-DCP-2 |
| RONALD J. TURNER, | ) | | 3:19-CR-151-TAV-DCP-3 |
| KEDARIS T. GILMORE, | ) | | 3:19-CR-151-TAV-DCP-4 |
| MAHLON T. PRATER, JR. | ) | | 3:19-CR-151-TAV-DCP-7 |
| DEMETRIUS D. BIBBS, | ) | | 3:19-CR-151-TAV-DCP-9 |
| JYSHON FORBES, and | ) | | 3:19-CR-151-TAV-DCP-10 |
| TREVOR COX, | ) | | 3:19-CR-151-TAV-DCP-14 |
| | ) | | |
| Defendants. | ) | | |

## MEMORANDUM OPINION AND ORDER

This criminal case is before the Court on the government's Motion for an Electronic Restraint System and/or Leg Irons to be Applied to all Defendants During Trial [Doc. 398]. Defendant Bibbs has filed a response in opposition [Doc. 419] which defendants Forbes, Cox, Prater, and Stewart have joined [Docs. 420, 432, 444, 447]. Defendant Ronald Turner has filed a response [Doc. 423] which defendants Prater and Stewart have joined [Docs. 444, 447]. Defendant Gilmore has also filed a response [Doc. 428]. The Court conducted a final pretrial conference on June 22, 2021, during which the Court heard testimony and argument regarding the motion. Assistant United States Attorneys David Lewen and Brent Jones appeared on behalf of the United States. Attorney Russell Greene appeared on behalf of defendant Alim Turner. Attorney Jessica McAffee appeared on behalf of defendant

Ushery Stewart. Attorney Robert Kurtz appeared on behalf of defendant Ronald Turner. Attorney Jamie Hughes appeared on behalf of Kedaris Gilmore. Attorney Gerald Gulley, Jr., appeared on behalf of defendant Mahlon Prater, Jr. Attorney Randall Reagan appeared on behalf of defendant Demetrius Bibbs. Attorney Michael Cabage appeared on behalf of defendant Jyshon Forbes. Attorney Forrest Wallace appeared on behalf of Trevor Cox. All defendants were also present. The motion is now ripe for adjudication.

## I. Case Summary

This case involves eight defendants who are scheduled to begin an approximately three-week joint trial on July 7, 2021. The defendants proceeding to trial include: Alim Turner, Ushery Stewart, Ronald Turner, Kedaris Gilmore, Mahlon Prater, Jr., Demetrius Bibbs, Jyshon Forbes, and Trevor Cox. Seven other defendants have been named in this case, all of whom have entered guilty pleas, including: Christopher Hounschell [Docs. 128, 154], Michael Scott Stewart [Docs. 72, 75], Camaron Billips [Docs. 391, 403], Seth Curtis [Docs. 135, 151], Antoinette Turner [Docs. 395, 451], Kiante Cooper [Docs. 296, 452], and Joshua Carmley [Docs. 314, 376].

The Second Superseding Indictment [Doc. 243] consists of twenty-one counts, though some counts (five, ten, eleven, fourteen, sixteen, seventeen, and twenty) apply only to defendants who have pleaded guilty. The charges relevant to the defendants proceeding to trial are summarized as follows:

- Count One: Conspiracy to distribute 50 grams or more of methamphetamine, and a quantity of fentanyl, Roxicodone, Xanax, marijuana, buprenorphine, and heroin, all in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A), (b)(1)(C), (b)(1)(D), (b)(1)(E), (b)(2).

2

- o Charges Alim Turner, Ushery Stewart, Ronald Turner, Kedaris Gilmore, Mahlon Prater, Jr., Demetrius Bibbs, Jyshon Forbes, and Trevor Cox.

- **Count Two**: Possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.
    - o Charges Alim Turner, Ushery Stewart, Kedaris Gilmore, Mahlon Prater, Jr., Demetrius Bibbs, and Trevor Cox.

- **Count Three**: Money laundering in violation of 18 U.S.C. § 1956(h).
    - o Charges Alim Turner, Ushery Stewart, Ronald Turner, Kedaris Gilmore, and Jyshon Forbes.

- **Count Four**: Distribution of 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 18 U.S.C. § 2.
    - o Charges Alim Turner, Ronald Turner, Ushery Stewart, Mahlon Prater, Jr.

- **Count Six**: Distribution of 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A).
    - o Charges Mahlon Prater, Jr.

- **Count Seven**: Possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i).
    - o Charges Mahlon Prater, Jr.

- **Count Eight**: Distribution of 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A).
    - o Charges Alim Turner.

- **Count Nine**: Possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i).
    - o Charges Alim Turner.

- **Count Twelve**: Possession with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2.
    - o Charges Demetrius Bibbs.

- **Count Thirteen**: Possession and brandishing of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and 18 U.S.C. § 2.
    - o Charges Demetrius Bibbs.

3

- <u>Count Fifteen</u>: Felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).
  - Charges Demetrius Bibbs.

- <u>Count Eighteen</u>: Distribution of 5 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).
  - Charges Alim Turner.

- <u>Count Nineteen</u>: Possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).
  - Charges Trevor Cox.

- <u>Count Twenty-One</u>: Distribution of 5 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).
  - Charges Kedaris Gilmore.

[Doc. 243].

All eight defendants proceeding to trial have remained in custody since indictment.

| Defendant | Date of Initial Detention Order | Detention Orders |
|---|---|---|
| Alim Turner | September 9, 2019 | Doc. 27 |
| Ushery Stewart | September 5, 2019 | Docs. 10, 141 |
| Ronald Turner | November 20, 2019 | Doc. 55 |
| Kedaris Gilmore | October 21, 2019 | Doc. 45 |
| Mahlon Prater, Jr. | March 26, 2020 | Doc. 123 |
| Demetrius Bibbs | July 23, 2020 | Docs. 163, 171 |
| Jyshon Forbes | December 1, 2020 | Doc. 305 |
| Trevor Cox | October 16, 2020 | Doc. 252 |

4

## II. Positions of the Parties

In its motion [Doc. 398], the government, on behalf of the United States Marshals Services ("USMS"), asks the Court to authorize the use of leg shackles as to all eight trial defendants. The government also requested the use of an electronic restraint system ("stun belt") for defendants Alim Turner, Ronald Turner, Mahlon Prater, Jr., and Demetrius Bibbs, but, during the hearing, withdrew the request for stun belts. The government contends that the defendants are dangerous individuals, that many of them have had disciplinary issues while in pretrial detention, and that the unique circumstances of this trial require the use of leg shackles to ensure the safety of everyone involved.

With the exception of Alim Turner, all of the defendants have either filed a response in opposition to the motion or have joined one of the responses [Docs. 420, 423, 428, 432, 444, 447]. Given the participation of Alim Turner's counsel during the hearing, and the opposition he voiced therein, the Court will deem Alim Turner as having also joined in the opposition to the instant motion. In opposing the motion, the defendants challenge the government's characterization of them as dangerous, and instead collectively argue that they have behaved during all court proceedings in this matter, that many of them have behaved during other court proceedings, such as trials in state court, and also argue that the use of leg shackles places them at risk of extreme prejudice if the jury were to see the restraints. Defendants contend that there are less prejudicial methods available to ensure courtroom security, such as the presence of USMS deputies.

5

### III. Summary of Testimony

During the June 22, 2021 hearing the Court heard the sworn testimony of deputy United States Marshal Matthew Byrum. Deputy Byrum testified that he has worked for the USMS for approximately fourteen years, and currently serves as the judicial security inspector for the Eastern District of Tennessee. As judicial security inspector, he is involved with maintaining the security of the courthouse and the people inside. Deputy Byrum indicated that the USMS would be providing security for the eight defendant trial in this case, which will begin on July 7, 2021, and will be held in courtroom 3B. Courtroom security for the trial will involve several deputy marshals.

Deputy Byrum testified that he was familiar with the general nature of the charges at issue in this case, which include various drug trafficking and firearm charges. He stated that he had some level of familiarity with each of the eight defendants, and that each of them are gang members.[1] The witness clarified that he was familiar with the criminal histories of the defendants, and that criminal histories often indicate whether the subject has any known gang affiliations.

Deputy Byrum opined that leg shackles would be needed to maintain security during the trial. The witness displayed the type of leg shackles which the USMS proposed to use during trial. He testified that the shackles are wrapped with tape and foam both to minimize any sound the shackles might make, and to help conceal the shackles. The witness noted

---

[1] There were multiple evidentiary objections over the course of the hearing, including as to testimony regarding alleged gang affiliation. The Court addresses the applicability of the Federal Rules of Evidence below.

6

that the tables in the courtroom were draped, which would also help prevent jurors from seeing the leg shackles. As an additional precaution, the witness testified that the defendants will only be moved when the jury is not in the courtroom. The witness confirmed that the USMS is withdrawing its request to use stun belts, but does still request the use of leg shackles on all eight defendants.

Deputy Byrum testified that, if convicted, the defendants face potential sentences in the range of twenty to thirty years. He indicated that cooperating co-defendants will testify at trial, which could result in heightened tensions. The witness stated that he consulted with other law enforcement agents regarding ongoing murder investigations related to some of the defendants. The government then focused its questioning as to the specific circumstances of each of the eight defendants.

## A. Alim Turner

Deputy Byrum testified that Alim Turner's criminal history includes convictions for narcotics distribution and sales, and that the defendant is currently under investigation for multiple homicides. The witness testified that he was familiar with a wiretap recording of a telephone call between Alim Turner and an unidentified male [Doc. 443-1] in which the defendant discusses plans to get revenge on rival gang members who killed one of defendants' friends. The deputy testified that the defendant has had to be physically restrained by jail staff, and that defendant has had noncompliance issues while awaiting trial. The witness stated that Alim Turner is a member of the Vice Lords.

On cross examination,[2] the witnesses testified that he did not recall the specifics of defendant's past drug conviction because he did not have the NCIC print out in front of him. The witness stated that law enforcement officers Glover and Stryker were the ones who told him about the homicide investigation regarding Alim Turner. The deputy indicated that Glover and Stryker had informed him of the current status of the investigation. The witness testified that his testimony as to defendant's membership in the Vice Lords was based on criminal history reports and other information provided to him by local jail officials and case agents. The witness stated that he did not have any firsthand knowledge on these issues.

### B. Ushery Stewart

Deputy Byrum testified that he is familiar with defendant Stewart's criminal history and indicated that Stewart is a Vice Lord. The witness stated that he is familiar with the government's filing regarding Stewart's pretrial detention [Doc. 133], including the attached photographs which depicted Stewart with other Vice Lord members, displaying gang signs, and holding firearms. The deputy testified that Stewart has had to be physically restrained by jail staff, including the use of a seven-point chair.

On cross examination, Deputy Byrum testified that while the defendants were wearing handcuffs during the hearing, they would not be wearing those at trial.

---

[2] Although cross examination took place after the completion of direct examination, for ease of reading, the Court summarizes the cross examination as to each defendant immediately following direct testimony as to that defendant.

8

### C. Ronald Turner

Deputy Byrum testified that Ronald Turner has a conviction for attempted homicide. He also indicated that the defendant has had noncompliance issues and has threatened officers.

On cross examination, Deputy Byrum agreed that the instant case mostly involved drug and firearms charges, but he did not have a copy of the indictment in front of him and did not recall what specific charges defendant Ronald Turner faced. The witness stated that leg shackles have been used in past trials in this District several times but could only recall one instance off the top of his head. The deputy stated that he did not know what range of punishment the defendant might face, did not know defendant's guideline range, and did not know what quantity of drugs was attributable to defendant.

Deputy Byrum testified that he would need to look at incident reports for the specifics and dates of noncompliance issues, but indicated that defendant has had several instances of noncompliance and has threatened officers at the jail several times. The deputy was not certain whether the incidents happened at the Knox County or Blount County detention facility. The deputy then reviewed his records at the request of defense counsel and confirmed that the incidents took place at Blount County. The deputy stated that the incident from the report he was looking at occurred on February 2, 2020. The witness did not know if there was a disciplinary hearing over the incident, but rather only knew what was included in the incident report.

Deputy Byrum testified that he had several different incident reports regarding defendant's behavior at the detention facility, but that none of the incidents involved violence. The witness stated that he was not aware of any instances of defendant threatening, or actually harming, any of the co-defendants who are expected to testify at trial.

Deputy Byrum confirmed that defendants will enter the courtroom from the back-left door, and that there are holding cells behind that door. The deputy stated that any witnesses who are in custody would likely also enter through that door. The witness indicated that a court security officer is normally positioned beside the witness stand and confirmed that court security officers would be present during trial. Deputy Byrum confirmed that USMS policy is to have a number of deputy marshals present in the courtroom equal to the number of defendants plus one, so, in this instance, there will be at least nine deputy marshals in the courtroom during trial, though they have the option of increasing that number, subject to availability. The deputy estimated that the witness stand was approximately thirty feet away from where defendant was sitting at the counsel table.

The deputy testified that he did not know whose custody defendant was in before he was indicted in this case, and indicated that he did not know if defendant had faced any disciplinary actions pre-indictment. The witness stated that he was not aware that defendant had taken part in two jury trials in Knox County Criminal Court with no incident.

Deputy Byrum confirmed that the courtroom is located on the third floor, and that the only way to leave the floor is by elevator, stairwell, or to jump over the railing, which

10

would involve at least a thirty-foot drop. The deputy confirmed that there are armed security officers at the first-floor entrance to the courthouse.

Deputy Byrum testified that during jury selection, jurors will be seated in the jury box, and would also be seated on the left side of the gallery (behind the prosecution).[3] The deputy stated that he did not believe potential jurors sitting in the gallery would be able to see the defendants' leg restraints. The deputy confirmed that several deputy marshals were seated behind the defendants, approximately four feet away. He indicated that he did not know how much time defendant had spent on lockdown at the detention facility, or whether defendant had access to exercise equipment. The witness confirmed that he did not have any specific information about defendant's physical condition.

### D. Kedaris Gilmore

Deputy Byrum testified that defendant Gilmore has charges including weapons possession, aggravated robbery, aggravated kidnapping, and carjacking. The deputy testified that the defendant is under investigation for homicide and has had noncompliance issues while in custody, though not as many as some other defendants.

On cross examination Deputy Byrum testified that he did not know the current status of the robbery, kidnapping, or carjacking charges, nor did he recall whether the charges were felonies or misdemeanors, though that information was included in the NCIC report. The deputy confirmed that he received information about the murder investigation from

---

[3] The plans for jury pool seating during voir dire have changed since the hearing and are discussed in detail below.

11

agents Stryker and Glover. He confirmed that the murder being investigated would have occurred prior to defendant being taken into custody in relation to this case, and that defendant has been in custody since his initial appearance in this case. Defendant did not know the current status of the murder investigation.

With respect to instances of noncompliance by defendant, Deputy Byrum stated that he believed the incidents were all rules violations rather than incidents of violence. The deputy was unaware of any threats by defendant against any co-defendants or witnesses.

The deputy testified that USMS staff who will likely assist with the trial have been with the USMS for from at least three years to maybe twenty years. The deputy agreed that the deputy marshals excel at their jobs and that they usually do not have problems in court, in part because of the security measures the USMS take to ensure court proceedings occur without incident.

### E. Mahlon Prater

Deputy Byrum testified that defendant Prater has charges and convictions for drug possession and resisting arrest. The deputy testified that defendant Prater, in conjunction with defendant Cox, attempted to intimidate one of the cooperating witnesses expected to testify in this case. During that incident, defendant Cox allegedly pulled a shank.

On cross examination, Deputy Byrum testified that the defendants may be seated in the same place during trial as they were at the hearing, but that things were always subject to change. The witness estimated that there was approximately twenty feet between the witness stand and the closest defendant, and perhaps thirty feet between the witness stand

12

and defendant Prater. The witness stated that a court security officer was seated about five feet from the witness stand. The witness agreed that there were approximately four or five deputy marshals seated directly behind the defendants, and there would likely be a similar number there during trial.

The witness agreed that if, hypothetically speaking, defendant Prater were to become upset with a witness and wanted to initiate an altercation, he would have to either move down the length of the defense table and then across the courtroom, passing several deputy marshals and court security officers along the way, or he would have to jump over the defense table, which would give him a shorter route to the witness stand, but he would still have to pass near the court security officer stationed beside the witness stand. The deputy emphasized that without leg restraints, it would be relatively easy for someone to jump over the table, taking only split seconds. The witness admitted that he had never seen defendant Prater jump over a table, or anything else, and that he had no knowledge regarding the agility of defendant Prater.

The witness confirmed that defendant has charges and convictions for drug possession and resisting arrest. The witness checked his notes and determined that the resisting arrest incident occurred in 2017, but he was unsure whether defendant was convicted or only charged with resisting arrest. Deputy Byrum confirmed that he had no firsthand knowledge of defendant Prater's criminal history, but that his knowledge was based on a criminal history report.

The deputy stated that he did not recall how long defendant has been in custody, and that he did not recall ever seeing defendant Prater being disruptive while in the custody of the USMS. The witness confirmed that he has never seen defendant be physically resistant or verbally abusive with USMS deputies, nor had he heard any reports of such behavior by defendant.

With respect to the incident which occurred in a detention facility between defendants Prater, Cox, and a potential witness in this case, Deputy Byrum stated that he had only read reports on the incident, and that he had no direct knowledge of the events. The deputy testified that he did not believe there was any video footage of the incident, but rather there were reports from an officer and another inmate who saw the event. Deputy Byrum indicated that the reports stated that defendants Prater and Cox approached the co-defendant, told the co-defendant that he needed to withdraw his guilty plea, and that the co-defendant better not testify. The deputy testified that he did not know of any reports that defendant Prater had been physical or violent with the co-defendant. Deputy Byrum could not recall whether Cox or Prater displayed the shank during the incident, did not know how far away the two were from the co-defendant at the time, nor did he know exactly how the shank was displayed.

The deputy testified that detention facility staff have had to restrain defendant Prater while in custody, and that defendant has had other noncompliance issues. Deputy Byrum stated that he believed the incident occurred in Blount County, and that he believed defendant Prater was involved in an altercation with another inmate. The deputy indicated

an incident report was created regarding the event, but he did not know if there was a formal disciplinary hearing. He stated that he did not recognize the name of the other person involved in the altercation, so he did not believe it was a co-defendant or witness in this case. They deputy stated that defendant Prater has not had to be restrained in the seven-point chair.

Deputy Byrum testified that he did not recall if defendant Prater has any tattoos, nor did he have knowledge of whether such tattoos would be gang related.

## F. Demetrius Bibbs

Deputy Byrum testified that defendant Bibbs has been convicted of drug sales, drug possession, weapon possession, and aggravated robbery and faces pending charges for aggravated assault and aggravated kidnapping. The deputy stated that defendant Bibbs has made threats against jail staff and has had to be restrained through the use of a seven-point chair.

The deputy indicated that he is familiar with the government's brief regarding defendant Bibbs's pretrial detention [Doc. 167], which includes pictures taken from a security camera which captured footage of an altercation between defendant Bibbs and a female subject. The deputy stated that he has seen the video footage of the incident, and that the video shows defendant Bibbs striking the woman with his fist.

At this point the government stated that it was incorporating its previously filed memoranda regarding the pretrial detention of defendants Bibbs [Doc. 167] and Stewart

15

[Doc. 133] and asked the Court to consider those filings in conjunction with the instant motion.

Deputy Byrum was then shown photographs captured from the video recording and he testified that the video shows defendant Bibbs strike the female subject, who is the mother of Bibbs's child, apparently knocking her unconscious. The deputy testified that the video went on to show defendant Bibbs attempting to move the apparently unconscious woman into a car.

On cross examination, Deputy Byrum confirmed that the video of the encounter between defendant Bibbs and his girlfriend was captured by a surveillance camera which was some distance away and that the camera did not capture any audio. At the start of the encounter, defendant Bibbs was near the driver's side door of a car, and the female was near the rear of the car. The deputy agreed that defendant Bibbs held his hands up, placed together, as if he were praying, and then, some time later, the female approached defendant Bibbs. The deputy indicated that he did not know what the two people were saying, and he did not know if the female had anything in her hands.

Deputy Byrum agreed that defendant Bibbs had been charged with aggravated kidnapping and assault in Hamilton County, but stated that he did not know the current status of those charges. The deputy did not know if a preliminary hearing had occurred on the charges, and the deputy confirmed that he had not spoken with the female in the video nor with defendant Bibbs.

16

Deputy Byrum stated that he has not had any significant interactions with defendant Bibbs, perhaps only seeing him in passing in the courthouse's holding cells. The deputy did not recall any records which indicated that defendant Bibbs fractured a hip when he was eleven years old. The deputy did agree that defendant Bibbs walks with a slight limp. The witness stated that leg shackles might make it a little more difficult for defendant Bibbs to walk, but that they should not be overly burdensome.[4]

Deputy Byrum confirmed that defendant Bibbs has had some disciplinary issues while in pretrial detention, and that one of those incidents involved breaking a sprinkler head. The deputy indicated that defendant Bibbs had also made threats against officers at the Blount County detention facility. The deputy stated that he knew that defendant Bibbs had made a report accusing a detention facility guard of assaulting him, but did not know any specifics. The witness stated that he did not know if there was a disciplinary hearing regarding the broken sprinkler head.

Deputy Byrum testified the he did not recall the exact date when defendant Bibbs was detained in relation to this case, nor did he recall what other facilities defendant might have been housed at pending trial. The deputy testified that he believed defendant Bibbs was currently being housed in the Knox County detention facility. The deputy could not recall if he had attended any of defendant Bibbs prior hearings in this case.

---

[4] The Court notes that during the hearing defendant Bibbs was wearing leg shackles, as he has for all earlier pretrial hearings, and there was no indication or argument that the leg shackles coupled with his past leg injury made him incapable of walking.

17

Deputy Byrum testified that he had heard a report, perhaps from one of the case agents, that during a prior hearing, when counsel for the government described defendant Bibbs as violent, defendant Bibbs allegedly made an exaggerated head nod indicating yes. The deputy agreed that this action did not violate courtroom decorum.

Deputy Byrum confirmed that defendant Bibbs had previously faced some sort of firearms charge, agreeing that it might have been a felon in possession charge and it might have been in this District. The deputy did not recall any courtroom incidents by defendant Bibbs during any proceedings related to that firearms charge. Deputy Byrum confirmed that defendant Bibbs's criminal history included an aggravated robbery charge, but the deputy did not know the specifics of that case or how old defendant was at the time. The deputy also confirmed that defendant has had some drug charges, but did not recall the specifics or if they involved a felony conviction.

Deputy Byrum confirmed that he did not investigate the details of all of defendant Bibbs's prior courtroom appearances, but instead just looked generally at his criminal history and any incident reports. The deputy agreed that the defendant was sitting at around the middle of a table that was approximately thirty to forty feet long with several marshals seated nearby and other guards by the doors of the courtroom.

### G. Jyshon Forbes

Deputy Byrum testified that defendant Forbes has a narcotics distribution conviction and that he is facing first-degree murder charges in a case pending in Davidson County,

18

Tennessee.  The witness indicated that defendant Forbes has also had noncompliance issues while in detention pending trial.

On cross examination, Deputy Byrum testified that he believed he had spoken briefly with one of the case agents regarding defendant Forbes, but he had not watched the video taken during the arrest of defendant Forbes.  The deputy stated that he did not discuss that arrest with the case agent.  The deputy stated that he only knew the general nature of the charges at issue in this case, and did not recall which defendant faced which charges. The deputy testified that he did look at defendant's criminal history, and that it did include drug charges, but he did not recall if they were felony charges.  He agreed that it was possible that the drug charges were misdemeanor charges, but that he did not know for sure.

Deputy Byrum testified that defendant Forbes's criminal history does not include charges for resisting or evading arrest, nor does it include any violent convictions, but he does currently face a murder charge in Davidson County, though the witness did not know any specifics regarding the murder charge.  The deputy stated that defendant Forbes has had some minor disciplinary issues while in custody, but none of them were for violence. Deputy Byrum agreed that one of the incident reports arose from defendant Forbes not taking prescribed medication because he was fasting in observance of Ramadan, and another was for taking his shirt off while he was working out.  The deputy did not know of any instances of defendant Forbes having to be restrained by detention facility staff, nor was the deputy aware of any problems when Forbes appeared in court.

19

### H. Trevor Cox

Deputy Byrum testified that defendant Cox faces charges for aggravated assault, weapons charges, and narcotics, and is also a suspect in a homicide investigation. The deputy also discussed defendant Cox's attempt, with defendant Prater, to intimidate a potential witness in this case while being housed at a detention facility in Ocilla, Georgia.

On cross examination, Deputy Byrum confirmed that he believed he had seen two reports regarding the Ocilla incident, and that the reports were given to him by officers at Ocilla. The deputy did not recall the exact date of the incident, but believed it happened in 2021. The witness stated that the reports indicated that a shank was involved, but he did not know if the shank was recovered or if a disciplinary hearing was held.

Deputy Byrum testified that he could not recall if he had been present for defendant Cox's prior appearances in this case, but that he was not aware of any incidents of defendant Cox being disruptive during hearings.

Deputy Byrum testified that he had not observed any of the defendants being disruptive during the instant hearing, but he stated that the defendants were also fully shackled, which would not be the case at trial. The deputy stated that with the number of people in the courtroom during trial, coupled with the possibility of cooperating witnesses testifying, there could be heightened emotions, which could then result in disruptions in the courtroom.

The deputy agreed that similar heightened tensions are present in almost any federal criminal trial, but he noted that one had to consider other factors as well, such as whether

the defendants have a history of violence, how close the defendants are to others, how they might react, and that all of those factors are involved in the USMS's determination of what security measures might be needed.

With respect to defendant Cox's criminal history, the deputy testified that he knew defendant had been charged with aggravated assault, as well as weapons and drug charges, but he did not recall when those charges were filed, whether they were felonies or misdemeanors, or other specifics. The deputy confirmed that case agents Stryker and Glover had advised him that defendant Cox is a suspect in several ongoing murder investigations. The deputy stated that he believed he had spoken with the agents once or twice.

Deputy Byrum testified that he is not a case agent in this case, but rather that his role is to ensure court security, so he has not reviewed all the evidence in this case. The deputy indicated that he was not aware that defendant Cox broke his ankle a few months ago while playing basketball, though he might recall an incident report about an injury.

## I. Other Factors

Deputy Byrum testified that the size of the courtroom also played a role in the USMS's request for the use of leg restraints. Specifically, the witness pointed out that with eight defendants going to trial, there would be many people in the courtroom, and the defendants would be within close proximity to witnesses, attorneys, and court staff. The deputy stated that leg shackles would help ensure that if something were to happen at trial,

the deputy marshals on location would have more time to react because the defendants would not be able to move as quickly.

The witness reiterated that the USMS no longer sought to use stun belts. He also testified about the use of table drapes to hide the leg shackles, as well as the padding on the restraints which helps both to hide the shackles and to muffle any noise they might make.

## IV. Legal Standard

Inherent in our country's criminal justice system is the presumption of innocence, which goes hand in hand with the constitutional right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). That presumption must be protected throughout trial, and when a criminal defendant appears before the jury, they generally do so without any obvious indicia of guilt so as not to potentially prejudice the jury. *Id*. at 504. Shackles are one such indicia, so their use during trial is restricted. *Ruimveld v. Birkett*, 404 F.3d 1006, 1011 (6th Cir. 2005).

In addressing the use of shackles during trial, the Supreme Court has held that "the Constitution forbids the use of visible shackles during . . . the guilt phase [of trial], unless that use is 'justified by an essential state interest' – such as the interest in courtroom security – specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-569 (1986)). The Sixth Circuit has elaborated on the issue, holding that "shackling a defendant at trial without an

22

individualized determination as to its necessity violates the due process clause." *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005).

Thus, before a court may order that a defendant be shackled during trial, the Court must make an individualized determination considering the following factors: "(1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security." *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005). In conducting this analysis, a court cannot simply defer to the request of security officers. Rather, the *Lakin* court elaborated that:

> [a]lthough a trial court might find a corrections officer's opinion highly relevant to answering the ultimate inquiry as to whether shackling is necessary in a particular case, an individualized determination under the due process clause requires more than rubber stamping that request. A corrections officer's preference does not excuse the district court from conducting the appropriate inquiry. Nor does the convenience of shackling a defendant justify its use.

*Id*.

## V.    Analysis

In this instance, the Court conducted a hearing on June 22, 2021, and, as summarized above, heard the testimony of Deputy Byrum as to the USMS's request for the use of leg shackles during the trial in this case. The Court will make particularized findings as to each defendant, but initially addresses an evidentiary issue.

23

## A. Rules of Evidence

In general, the Federal Rules of Evidence apply to criminal proceedings in United States district courts. Fed. R. Evid. 1101(a) and (b). However, the Rules specifically exclude some types of proceedings, including "miscellaneous proceedings such as: extradition or rendition; issuing an arrest warrant, criminal summons, or search warrant; a preliminary examination in a criminal case; sentencing; granting or revoking probation or supervised release; and considering whether to release on bail or otherwise." Fed. R. Evid. 1101(d)(3). "Some courts have found that the list [of the types of miscellaneous proceedings] in Rule 1101(d) is not exhaustive." *Garvais v. Reliant Inventory Sols. Inc.*, No. 2:09-cv-0389, 2010 U.S. Dist. LEXIS 120413, at *14 (S.D. Ohio Nov. 15, 2010) (citing cases).

The court has considered Rule 1101 and finds that the instant hearing is similar to some or all of those types of miscellaneous proceedings referenced in Rule 1101(d)(3). Accordingly, the Court finds that the hearing regarding the use of leg shackles was a miscellaneous proceeding to which the Federal Rules of Evidence do not apply. In reaching this conclusion, however, the Court has considered the objections defense counsel made during the hearing, and did take those objections into consideration in determining what weight to give the evidence presented.

## B. Generalized Findings

While the Court must make individualized determinations on the use of shackles for each defendant, there are some considerations which apply equally to all eight defendants.

24

In the interest of judicial economy, the Court consolidates the analysis common to all defendants herein rather than simply repeating it for each of the Court's individualized analyses.

One of the factors the Court must consider is "the state of both the courtroom and the courthouse." *Lakin*, 431 F.3d at 964. The Court notes that the trial in this matter will be conducted in courtroom 3B. The Court normally conducts business in courtroom 4, but while courtroom 4 is generally larger than courtroom 3B, much of that space is taken up by courtroom 4's larger audience gallery. The actual usable space within the well of courtroom 4, where counsel and defendants are located, is limited. The Court considered different layouts of counsel tables within courtroom 4, but determined that there simply was no feasible method of accommodating all eight defendants, their attorneys, and other necessary personnel in courtroom 4.

The Court then considered the use of other courtrooms within the courthouse and determined that courtroom 3B could accommodate a trial of this size. Additional tables have been added to the courtroom to accommodate all eight defendants and their attorneys. Courtroom 3B also will allow the USMS quick access to holding cells on different floors of the courthouse, which will facilitate the safe and efficient movement of defendants during breaks in the trial.

All of these considerations are relevant because the Court must consider the state of the courtroom. To the extent that defendants may argue that courtroom 4 would serve as a better venue for this trial, the Court has already considered that issue and rejected it. And

25

while courtroom 3B will accommodate all of the defendants, it will still be a very tight fit. The chairs normally located at counsel tables have been replaced by smaller chairs to accommodate all the defendants and their attorneys at the defense tables. To maintain parity, the chairs at the prosecution's table have also been replaced.

The Court has also replaced the chair in the witness stand with a much taller seat to ensure that the witness is visible to all defendants. To the extent that some members of defense counsel may wish a better view of the witness stand (or the potential jurors during voir dire), the Court has placed additional chairs along the wall behind the defense tables and already informed counsel that they could move to those chairs if needed.

In the end, the close quarters in which this trial will be conducted, coupled with the number of defendants, both play a major role in the Court's decision to authorize the use of leg shackles. The Court routinely conducts trials with one to four defendants. Trials with eight defendants are rarer and greatly complicate the USMS's ability to ensure the security of everyone present at trial. When trying two or three defendants, the Court can readily ensure that there is sufficient security present (whether through deputy marshals or court security officers) so that in the hypothetical situation that all of the defendants made a concerted effort to disrupt the trial, there would be sufficient manpower to quickly regain control. That task becomes much more daunting when eight defendants are on trial at once. And while some defense counsel argued for a greatly increased security presence within the courtroom, as opposed to the use of leg shackles, there is a practical limit to how many deputy marshals can be available for trial and fit within the courtroom, not to mention that

a significantly increased presence of deputy marshals in the courtroom would have a commensurately increased risk of endangering the presumption of innocence.

The Court's analysis on these issues also involves another of the *Lakin* factors: "whether there is a less prejudicial but adequate means of providing security." *Lakin*, 431 F.3d at 964. As can be discerned from the discussion above, the Court has considered different locations for the trial and the possibility of different security arrangements. In addition, the USMS itself initially requested the use of stun belts for some of the defendants, but subsequently withdrew that request. After considering all of the relevant factors (including the more individualized factors set forth below), the Court finds that there are no less prejudicial but adequate means of providing security other than the use of leg shackles.

The Court is taking steps to ensure that the defendants' leg shackles will not be visible to the jury or potential jurors. The defense tables will be fitted with cloth skirts, so that defendants' legs are not visible. To maintain parity, the government's table will also be skirted. While the Court had initially considered having some potential jurors sit on one side of the audience gallery during voir dire, the Court will instead seat all potential jurors either in the jury box or in chairs in front of the jury box. In addition, jurors and potential jurors will be brought into the courtroom from the left entrance behind the bench. These changes will ensure that no juror will be able to see the defendants wearing leg shackles.

In addition, defendants will not be moved in the presence of the jury. And while the defendants will necessarily sit and stand when the jury enter the courtroom, the padding

on the shackles will help minimize the chance of the jurors hearing the clacking of shackles. Further minimizing that risk is the fact that there is necessarily some background noise involved with everyone in the courtroom sitting and standing for the jury.

The Court also addresses the argument made by some defendants that there have been no prior incidents during prior hearings in this case. During pretrial hearings, defendants who have been detained pending trial who appear in the courtroom are fully shackled, wearing a combination of leg shackles, handcuffs, and a chain around their waist. Thus, the fact that there have been no incidents when the defendants were fully restrained is not necessarily indicative of how defendants might act during trial without any shackles.

Finally, the Court notes, as it addresses further below, that there is evidence of record as to the gang membership of all but one of the defendants.[5] And while membership in a gang is not illegal, the fact that the majority of the defendants have participated in such organizations, and are presumably accustomed to working with each other to achieve their organization's goals, heightens the Court's concerns that if one defendant were to become disruptive, some or all of the other defendants might join in. The danger that eight defendants acting in concert would pose is far, far greater than the danger which one or two individuals acting on their own might pose, and the Court must take that fact into account in determining whether the use of leg shackles is appropriate.

---

[5] There was sworn testimony during the detention hearing of defendant Stewart identifying defendant Cox as a Vice Lord, but as defendant Cox was not involved in that hearing, the Court will not take that source into consideration for the purpose of this motion [Doc. 144, p. 12]. Regardless of that fact, Deputy Byrum that defendant Cox joined with defendant Prater in allegedly intimidating a potential witness in this case.

28

With that said, though, the Court is committed to ensuring that the defendants' presumption of innocence is protected and has taken the steps necessary to ensure that the use of leg shackles will not endanger the defendants' fundamental right to a fair trial. The Court now turns to the individualized portion of its *Lakin* analysis.

## C. Alim Turner

While the Court considered two of the four *Lakin* factors above, that leaves two additional factors: "the defendant's record, his temperament, and the desperateness of his situation" and "the defendant's physical condition." *Lakin*, 431 F.3d at 964. With respect to the first factor, the Court notes that defendant Alim Turner faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life.[6] Defendant also faces two gun charges, counts two and nine, which each impose a consecutive sentence of five years to life. Thus, if convicted, defendant faces a statutory sentence, before the application of the sentencing guidelines, of twenty years to life. This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant has prior drug convictions, and is under investigation with respect to multiple homicides. And while the Court does not lend as much evidentiary weight to

---

[6] The Court summarized the Second Superseding Indictment and which defendants are charged with which counts in section I, above. All defendants are charged with count one, and as it imposes a statutory sentence which is equal to or greater than any other non-firearm related charge, the Court need not, for the purpose of this analysis, consider the potential sentences defendants might face for the other non-firearm related charges.

pending charges or ongoing investigations as it does to prior convictions, the Court finds that such evidence is relevant to its analysis. The Court takes into account the transcript of a wiretap recording between defendant and an unidentified male [Doc. 443-1] during which defendant appears to plan a retaliatory attack against rival gang members for the murder of one of defendant's friends. That wiretap recording also includes multiple references to membership in the Vice Lords.[7] The Court also takes into consideration the sworn statements regarding defendant in the three wiretap applications [Docs. 231-1, 231-2, 231-3], which include the allegation that defendant Alim Turner is the leader of the Knoxville Vice Lords chapter. In addition, Deputy Byrum testified that defendant has had to be physically restrained by jail staff and has also had disciplinary issues while awaiting trial.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he appeared to be a young adult male in relatively good physical condition.

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Alim Turner during trial.

---

[7] As the Court has noted in other rulings, gang membership, standing alone, is not illegal [Doc. 454]. However, the Court has also found that the evidence is relevant to the issue of participation in the alleged drug conspiracy [*Id.*]. In addition, membership in a gang and/or the drug conspiracy is relevant for determining whether the defendants might work together in the event that some incident should occur during trial. Given the Court's concerns about the possibility of multiple defendants acting out at the same time, as discussed above, the fact that some or all of the defendants know each other and/or share a common gang membership would be relevant for the *Lakin* analysis.

30

### D. Ushery Stewart

With respect to the first *Lakin* factor, the Court notes that defendant Stewart faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life. Defendant also faces a gun charge, count two, which imposes a consecutive sentence of five years to life. Thus, if convicted, defendant Stewart faces a statutory sentence, before the application of the sentencing guidelines, of fifteen years to life. This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant is a Vice Lord, referencing evidence the government introduced in support of defendant Stewart remaining in pretrial detention [Docs. 133, 141]. The Deputy testified that defendant has had to be physically restrained by jail staff, including the use of a seven-point chair. The record also includes evidence that defendant has previously been charged with armed carjacking and drug trafficking [Docs. 133, 141].

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition.

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Stewart during trial.

31

### E. Ronald Turner

With respect to the first *Lakin* factor, the Court notes that defendant Ronald Turner faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life. Thus, if convicted, defendant Stewart faces a statutory sentence, before the application of the sentencing guidelines, of ten years to life. While not as great as the potential sentence faced by some of the other defendants, this is still a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant has a conviction for attempted homicide and that he has had noncompliance issues while in jail. One of the sworn wiretap applications [Docs. 231-3 at ¶ 18(q)] indicates that defendant is a member of the Vice Lords, that he, at the time, was serving a ten year sentence for three counts of attempted second-degree murder, possession of cocaine, and possession of a firearm during commission of a dangerous felony, and that he continued to facilitate drug distribution from within prison via the use of cell phones.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition.

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Ronald Turner during trial.

32

**F. Kedaris Gilmore**

With respect to the first *Lakin* factor, the Court notes that defendant Gilmore faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of fifteen years and a maximum of life.[8]  Defendant also faces a gun charge, count two, which imposes a consecutive sentence of five years to life.  Thus, if convicted, defendant Gilmore faces a statutory sentence, before the application of the sentencing guidelines, of twenty years to life.  This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant Gilmore has faced charges which include weapons possession, aggravated robbery, aggravated kidnapping, and carjacking.  One of the sworn wiretap affidavits at issue in this case indicates that defendant was the former leader of the local chapter of the Vice Lords, before being incarcerated for an aggravated robbery conviction in 2016, and that he remains a member of the gang [Doc. 231-1 at ¶ 16(e)].  Deputy Byrum testified that defendant is currently under investigation for homicide and had has had noncompliance issues while in custody pending trial.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition.

---

[8]  The government has filed a Notice of Enhancement [Doc. 96] which advises that he faces an increased potential penalty as to count one because of defendant's past serious violent felony conviction.

33

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Gilmore during trial.

### G. Mahlon Prater

With respect to the first *Lakin* factor, the Court notes that defendant Prater faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life. Defendant also faces a gun charge, count two, which imposes a consecutive sentence of five years to life. Thus, if convicted, defendant Prater faces a statutory sentence, before the application of the sentencing guidelines, of twenty years to life. This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant has a mix of convictions and pending charges for drug possession and resisting arrest. He further testified that defendant Prater was involved in an attempt to intimidate a potential witness in this case. One of the sworn affidavits in support of the wiretaps at issue in this case [Doc. 231-3 at ¶ 18(o)] indicates that defendant Prater is a member of the Vice Lords.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition.

34

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Prater during trial.

## H. Demetrius Bibbs

With respect to the first *Lakin* factor, the Court notes that defendant Bibbs faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of fifteen years and a maximum of life.[9]  Defendant also faces two gun charges, counts two and thirteen, the first of which imposes a consecutive sentence of five years to life and the second of which imposes a consecutive sentence of seven years to life.  Thus, if convicted, defendant Bibbs faces a statutory sentence, before the application of the sentencing guidelines, of twenty-seven years to life.  This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant Bibbs has convictions for drug sales, drug possession, weapon possession, and aggravated robbery, and has pending charges for aggravated assault and aggravated kidnapping.  The deputy further testified that defendant has made threats against jail staff and has had to be restrained through the use of a seven-point chair.

The government incorporated its brief in opposition [Doc. 167] to defendant Bibbs's request for release pending trial.  In that brief, the government alleged that defendant is a

---

[9]  The government has filed a Notice of Enhancement [Doc. 95] which advises that he faces an increased potential penalty as to count one because of defendant's past serious violent felony conviction.

member of the Bloods gang, and more fully described the alleged encounter between Bibbs and the mother of his young child which was captured on video and discussed during the instant hearing.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is a young adult male, approximately in his late twenties, who appeared to be in relatively good physical condition. There is testimony that defendant suffered a broken hip in his youth which has left him with a limp, but the Court finds that there is no indication that the leg shackles will unduly hamper defendant's movement during trial. In addition, the Court notes that defendant's alleged limp did not prevent him from allegedly assaulting the mother of his young child.

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Bibbs during trial.

### I. Jyshon Forbes

With respect to the first *Lakin* factor, the Court notes that defendant Forbes faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life. Thus, if convicted, defendant Forbes faces a statutory sentence, before the application of the sentencing guidelines, of ten years to life. While not as great as the potential sentence faced by some of the other defendants, this is still a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

36

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant has a prior narcotics distribution conviction, and that he is currently facing first-degree murder charges in a case pending in Davidson County, Tennessee. The deputy further testified that defendant has had noncompliance issues while in detention pending trial, though later clarified that the incidents were all minor and non-violent in nature. In his recent motion in limine, defendant stated that his pending charges in Davidson County include aggravated robbery, felony murder, and first-degree murder [Doc. 413].

The Court also notes that during the April 2, 2021, hearing on defendant Forbes's motion to suppression, Tennessee Highway Patrol Officer Ryan Fletcher testified that he had been advised by his supervisor that he would be assisting the FBI with a traffic stop of a vehicle occupied by two individuals who were members of the Vice Lords [Doc. 436, p. 21]. The driver of the vehicle in question was defendant Forbes, and the passenger was defendant Gilmore [Doc. 436, p. 39].

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition.

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg shackles as to defendant Forbes during trial.

37

### J. Trevor Cox

With respect to the first *Lakin* factor, the Court notes that defendant Cox faces a statutory term of imprisonment as to count one, the drug conspiracy charge, of a minimum of ten years and a maximum of life. Defendant also faces a gun charge, count two, which imposes a consecutive sentence of five years to life. Thus, if convicted, defendant Cox faces a statutory sentence, before the application of the sentencing guidelines, of fifteen years to life. This is a significant potential sentence and reflects the "desperateness" of defendant's situation during trial.

With respect to defendant's criminal record and his temperament, Deputy Byrum testified that defendant Cox faces charges for aggravated assault, as well as weapons and narcotics charges. The deputy stated that defendant is also a suspect in a homicide investigation. Defendant Cox, in conjunction with defendant Prater, was involved in an attempt to intimidate a potential witness in this case, during which one of the defendants allegedly displayed a shiv.

With respect to defendant's physical condition, defendant appeared in person for the instant hearing, and the Court noted that he is young adult male who appeared to be in relatively good physical condition. During the hearing defense counsel submitted that defendant Cox broke his ankle a few months ago, but the Court finds there is no evidence that the alleged injury would be exacerbated by the use of leg shackles, or that shackles would unduly hamper defendant's movement at trial.

38

After reviewing the evidence presented at the hearing, coupled with other relevant evidence in the record, the Court finds that all of the *Lakin* factors weigh in favor of the use of leg restraints as to defendant Cox during trial.

## VI. Conclusion

Accordingly, for the reasons set forth more fully above, it is hereby **ORDERED** that the government's motion **[Doc. 398]** is **GRANTED** to the extent that the United States Marshals Service is authorized to use leg shackles as to all eight defendants proceeding to trial.

IT IS SO ORDERED.

s/ Thomas A. Varlan_____
UNITED STATES DISTRICT JUDGE